BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
THOMAS J. O'REARDON II (247952)
600 B Street, Suite 1550
San Diego, CA 92101
Telephone: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
lhurst@bholaw.com
toreardon@bholaw.com

HARRISON PATTERSON & O'CONNOR LLP
JAMES R. PATTERSON (211102)
ALISA A. MARTIN (224037)
402 West Broadway, 29th Floor
San Diego, CA 92101
Telephone: 619/756-6990
619/756-6991 (fax)
jpatterson@hpolaw.com
amartin@hpolaw.com

BONNETT FAIRBOURN FRIEDMAN
& BALINT, PC
TODD D. CARPENTER (234463)
600 West Broadway Suite 900
San Diego, CA 92101
Telephone: 619/756-6978
602/274-1199 (fax)
tcarpenter@bffb.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PHILLIP R. CORVELLO, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK N.A. d/b/a WELLS FARGO HOME MORTGAGE d/b/a AMERICA'S SERVICING COMPANY,<br><br>Defendant. | No.:<br><br>CLASS ACTION<br><br>CLASS ACTION COMPLAINT FOR:<br><br>1. BREACH OF CONTRACT;<br>2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;<br>3. VIOLATION OF THE UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE §17200, *et seq.*; and<br>4. DECLARATORY RELIEF<br><br>DEMAND FOR JURY TRIAL |

1    Plaintiff Phillip R. Corvello ("plaintiff"), brings this action on behalf of himself and all

2    others similarly situated against defendant Wells Fargo Bank N.A. d/b/a Wells Fargo Home

3    Mortgage d/b/a America's Servicing Company ("Wells Fargo" or "defendant"), and states:

4                              **NATURE OF THE ACTION**

5    1.    Defendant systematically fails to honor its promises and obligations relating to

6    mortgage modifications.  Pursuant to federal programs and direct contractual agreements with

7    ordinary consumers, mortgage servicers, including defendant, are obligated to reduce monthly

8    mortgage payments to affordable levels or move borrowers to more stable products.  Based on

9    their promises to help borrowers stay current on their mortgages, mortgage servicers, like

10   defendant, have received ***billions*** of dollars from borrowers and government programs.  In

11   fact, in October 2008, Wells Fargo accepted $25 billion in Troubled Asset Relief Program

12   ("TARP") funds.  12 U.S.C. §5211.

13   2.    On March 4, 2009, the Making Home Affordable Plan was signed into federal

14   law as part of the Emergency Economic Stabilization Act of 2008.  The Making Home

15   Affordable Plan has two components: (a) the Home Affordable Refinance Program, and (b) the

16   Home Affordable Modification Program ("HAMP").  As for HAMP, its stated purpose is to

17   provide eligible homeowners the opportunity to modify their mortgages to make them more

18   affordable.  In furtherance of HAMP's goals, the Treasury Department, through Fannie Mae,

19   entered into agreements ("Servicer Participation Agreements") with mortgage servicers.

20   3.    On April 13, 2009, Wells Fargo, signed a Servicer Participation Agreement for

21   HAMP (attached hereto as Exhibit A) (the "Wells Fargo Servicer Participation Agreement").

22   By signing the Servicer Participation Agreement, Wells Fargo agreed to perform specified

23   loan modification and other foreclosure prevention services.

24   4.    Wells Fargo's Servicer Participation Agreement requires Wells Fargo to modify

25   loans, and identifies objective criteria to determine which loans are eligible for modification

26   and how the loans should be modified.  The unambiguous purpose of the Servicer Participation

27   Agreement is to provide loan modification services to eligible borrowers.  Plaintiff and Class

28

BLOOD HURST & O'REARDON, LLP

00023458

CLASS ACTION COMPLAINT                                                    1

1    members (defined below) are the intended third-party beneficiaries of Wells Fargo's Servicer

2    Participation Agreement under HAMP.

3        5.    The Servicer Participation Agreement ("SPA") incorporates all previous

4    guidelines, procedures, instructions and communications, including all "Supplemental

5    Directives" issued by the United States Treasury Department, Fannie Mae and Freddie Mac in

6    connection with the duties of a participating servicer, Wells Fargo. In September 2010, these

7    documents, including the Supplemental Directives, were compiled and incorporated into one

8    set of HAMP guidelines entitled, "Making Home Affordable Program Handbook for Servicers

9    of Non-GSE Mortgages, Version 2.0 As of September 22, 2010" (the "Handbook").

10       6.    After accepting billions of dollars in federal relief funds under HAMP, Wells

11   Fargo has not followed through with its responsibilities, contractual obligations, and promises

12   to modify home mortgages of consumers at risk of foreclosure. Instead, it ignores eligible

13   participants altogether, or extends promises to modify mortgages, accepts trial payments, but

14   then fails to permanently modify mortgages.

15       7.    Under the HAMP guidelines, Wells Fargo is obligated to identify and contact

16   borrowers eligible for loan modifications based upon their delinquency status. Borrowers at

17   imminent risk of default may also contact Wells Fargo to initiate the modification process.

18       8.    At the onset of the modification process, Wells Fargo requests and gathers

19   specific income documentation and confirms the eligibility of the borrower applicants

20   consistent with the HAMP guidelines. After Wells Fargo collects this information, it screens

21   the applicants through the HAMP underwriting process to determine: (a) the feasibility of the

22   modification (referred to as the HAMP "waterfall" procedure) and; (b) whether the value of

23   the modified loan exceeds the expected value of the loan were it not modified (the "Net

24   Present Value" test).

25       9.    After Wells Fargo determines if the borrower is eligible for the modification

26   and confirms the feasibility of the new terms, Wells Fargo provides the borrower a "Trial

27   Period Plan" ("TPP") contract offer. Under the terms of the TPP offer, if the borrower

28   satisfies two conditions precedent by: (a) making three "modified" trial payments (over the

BLOOD HURST & O'REARDON, LLP

1   course of three months); and (b) remaining eligible with respect to the other HAMP criteria

2   (maintaining employment, income level and financial hardship), then Wells Fargo "will"

3   provide the borrower with a permanent loan modification.

4       10.   HAMP guidelines require Wells Fargo to fully perform the underwriting

5   process, including determining the feasibility and calculating the net present value test for the

6   modification *before* accepting the borrower applicant's initial Trial Period Plan payment.

7       11.   However, rather than comply with the HAMP guidelines, Wells Fargo

8   systematically and impermissibly collects TPP payments before completing the underwriting

9   process. Additionally, Wells Fargo manipulates aspects of the underwriting process, resulting

10  in the rejection of applicants that should otherwise be qualified to receive a loan modification.

11      12.   Wells Fargo's manipulation of the underwriting process and the NPV criteria

12  results in the improper rejection of modification applicants. Thus, Wells Fargo improperly

13  benefits at the expense of borrowers by collecting fees, government incentives, and Trial

14  Period Plan payments it would not otherwise receive were it to engage in the program as

15  intended.

16      13.   In addition to Wells Fargo's breach of the Servicer Participation Agreement,

17  Wells Fargo breached its express loan modification offers made directly to plaintiff and Class

18  members. Wells Fargo extended trial period loan modification offers to plaintiff and Class

19  members. Wells Fargo's trial offer is clear and unambiguous: if plaintiff and Class members

20  comply with stated requirements, Wells Fargo will provide a permanent loan modification

21  offer. Plaintiff and Class members held up their end of the bargain, providing Wells Fargo

22  with financial hardship documentation and Trial Period Plan payments, but Wells Fargo has

23  not provided permanent loan modification offers.

24      14.   Wells Fargo's conduct violates the law by making false and misleading

25  representations that are likely to deceive the public, offending the public policies behind

26  government programs designed to assist homeowners, and breaching contractual obligations.

27      15.   Plaintiff brings this action on behalf of himself and other similarly situated

28  consumers in the United States whose loans have been serviced by defendant, who made an

BLOOD HURST & O'REARDON, LLP

00023458      CLASS ACTION COMPLAINT                                3

1    eligible request for a HAMP trial-period loan modification, complied with trial period loan

2    requirements, and who never received a permanent loan modification. Plaintiff alleges causes

3    of action for: breach of contract (Direct – for breach of the Trial Period Plan contracts; Third

4    Party Beneficiary – for breaching their obligations under the SPA to comply with the HAMP

5    guidelines and modify the mortgages of distressed borrowers, and promissory estoppel, for

6    inducing borrowers to make Trial Period Plan payments in reliance on Wells Fargo's offer to

7    permanently modify their loans), breach of the implied covenant of good faith and fair dealing,

8    violations of the Unfair Competition Law, and seeks declaratory and injunctive relief.

9    **JURISDICTION AND VENUE**

10    16.    This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The

11    matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000

12    and is a class action in which greater than two-thirds of the Class members are citizens of

13    states different from Wells Fargo.

14    17.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 in that many of the

15    acts and transactions giving rise to this action occurred in this district and because defendant:

16            (a)    is headquartered in this district;

17            (b)    is authorized to conduct business in this district and has intentionally

18    availed itself of the laws and markets within this district through the promotion, marketing,

19    distribution and sale of its products in this district;

20            (c)    does substantial business in this district; and

21            (d)    is subject to personal jurisdiction in this district.

22    18.    Intradistrict Assignment: Pursuant to Civil Local Rules 3-2(c)-(d), and 3-5(b),

23    defendant is headquartered in San Francisco County, this action otherwise arises in San

24    Francisco County, and it is therefore appropriate to assign this action to the San Francisco

25    Division.

26    **PARTIES**

27    19.    At all times relevant to this matter, plaintiff Phillip R. Corvello resides and

28    continues to reside in Fairfield, California. During the class period, plaintiff was eligible for a

1   loan modification from Wells Fargo. Wells Fargo offered plaintiff a HAMP loan

2   modification, and in reliance on Wells Fargo's offer plaintiff complied with all of his duties

3   and responsibilities, including timely submitting each of the Trial Period Plan payments. But,

4   Wells Fargo failed to provide plaintiff with a permanent loan modification as promised. As a

5   direct result of Wells Fargo's unlawful and unfair conduct described herein, including its

6   breach of contract, plaintiff suffered injury in fact and lost money or property.

7        20.    Defendant Wells Fargo N.A. is incorporated in the state of North Dakota, and is

8   headquartered in San Francisco, California. Defendant is registered to do business in the State

9   of California, and does business in the State of California. From its headquarters in California,

10   defendant markets, sells, and services residential home mortgage loans throughout the United

11   States, including to tens of thousands of consumers in the State of California. Based on 2009

12   year-end data, Wells Fargo Home Mortgage was the nation's number one total mortgage

13   producer and the number two servicer of home mortgages. America's Servicing Company

14   ("ASC") is a division of Wells Fargo Home Mortgage that services loans, originated and

15   underwritten by Wells Fargo and other lenders.

## FACTUAL ALLEGATIONS

### The Congressional Response to the Economic Crisis of 2008

18        21.    The Emergency Economic Stabilization Act of 2008 (the "Act"), commonly

19   referred to as the "bailout" of the United States' financial system, was enacted in response to

20   the subprime mortgage crisis authorizing the United States Secretary of the Treasury to

21   purchase distressed assets, especially mortgage-backed securities, and make capital injections

22   into the United States' banking system. The Act was signed on October 3, 2008. 12 U.S.C.

23   §5201.

24        22.    The purpose of the Act was twofold: to restore liquidity and stability to the

25   financial system, and to "preserve homeownership." *Id.*

26        23.    In addition to allocating $700 billion to the United States Department of the

27   Treasury, the Act also specifically granted the Secretary of the Treasury the authority to

28   establish the Troubled Asset Relief Program or TARP. 12 U.S.C. §§5211, 5225 (2008). In the

BLOOD HURST & O'REARDON, LLP

00023458

CLASS ACTION COMPLAINT              5

1    administration of TARP, Congress mandated that the Secretary "shall" take into consideration

2    the "need to help families keep their homes and to stabilize communities." 12 U.S.C.

3    §5213(3). To that end, Congress further created two specific sections within Title I of the Act

4    related to homeowners. *Id.* Section 109 is entitled "Foreclosure Mitigation Efforts." Section

5    109 specifically states that the Secretary "shall" implement a plan to "maximize assistance for

6    homeowners." 12 U.S.C. §5219(a). These efforts must be coordinated with other federal

7    agencies including the Federal Housing Finance Agency, which was established as the

8    conservator for Fannie Mae and Freddie Mac. *Id.*

9         24.    The Act further requires the Secretary to consent to any reasonable loan

10   modification offer: "[T]he Secretary shall consent, where appropriate, and considering net

11   present value to the taxpayer, to reasonable requests for loss mitigation measures, including

12   term extensions, rate reductions, principal write downs, increases in the proportion of loans

13   within a trust or other structure allowed to be modified, or removal of other limitations on

14   modifications." 12 U.S.C. §5219(c). Similarly, Section 110 requires the Federal Housing

15   Finance Agency, as conservator for Fannie Mae and Freddie Mac, to create and implement a

16   plan to prevent foreclosures. Specifically, the Act states: "[T]he Federal property manager

17   [defined, in part, as the Federal Housing Finance Agency] shall implement a plan that seeks to

18   maximize assistance for homeowners and ... minimize foreclosures." 12 U.S.C. §5220(b).

19   The statutory tools to be used by Fannie Mae and Freddie Mac include reducing interest rates

20   and reducing the principal balance of mortgage loans. *Id.* §5220(b)(2).

21              **The Creation of the Making Home Affordable Program and HAMP**

22        25.    Pursuant to its legal authority, the Secretary of the Treasury and the Director of

23   the Federal Housing Finance Agency created and announced the Making Home Affordable

24   Program on February 18, 2009. The Making Home Affordable program consists of two sub-

25   programs. The first sub-program relates to the creation of refinancing products for individuals

26   with minimal or negative equity in their home, which eventually was entitled the Home

27   Affordable Refinance Program or HARP. The second sub-program relates to the creation and

28

BLOOD HURST & O'REARDON, LLP

00023458        CLASS ACTION COMPLAINT                                              6

1    implementation of a uniform loan modification protocol, which eventually was entitled the

2    Home Affordable Modification Program or HAMP.

3        26.    HAMP is the specific program at issue in this case. The scope of HAMP is

4    broad; approximately three to four million homeowners in the United States are potentially

5    eligible for the program. The Treasury Department has allocated, at minimum, $50 billion of

6    its TARP money to fund the refinance and modification programs and offered an additional

7    $25 billion of non-TARP funds, totaling $75 billion. 12 U.S.C. §5211(a)(1) (authorizing the

8    Secretary to use TARP funds to purchase assets in accordance with the Emergency Economic

9    Stabilization Act of 2008).

10       27.    HAMP applies to any mortgage loan owned by Fannie Mae and Freddie Mac,

11   as well as any loans owned by companies that accepted other TARP money or volunteered to

12   participate in the program.

13                    **Wells Fargo's Obligation to Participate in HAMP**

14       28.    Wells Fargo is in the business of servicing residential mortgage loans.

15       29.    In consideration for receipt of federal funds and loan guarantees under TARP,

16   Participating Servicers, including Wells Fargo, were required to execute a Servicer

17   Participation Agreement ("SPA") with the Treasury Department.

18       30.    On April 13, 2009, Michael J. Heid of Wells Fargo Home Mortgage executed a

19   Servicer Participation Agreement. *See* Exhibit A.

20       31.    By voluntarily executing a Servicer Participation Agreement, Wells Fargo

21   became a "participating servicer," and is thereby contractually bound by HAMP's

22   requirements, including performing HAMP's loan modification directives.

23       32.    The SPA expressly incorporated all of the HAMP "Program Documentation"

24   available to Participating Servicers at www.HMPadmin.com, and "includes all of the Program

25   Guidelines and Supplemental Directives issued by Treasury and made available to

26   Participating Servicers at www.HMPadmin.com prior to the Effective Date of the Agreement,"

27   which "may be modified or amended from time to time." *See* Exhibit A, Servicer Participation

28   Agreement, at 2.

BLOOD HURST & O'REARDON, LLP

1    33.    Collectively, the Program Documentation forms the whole of the duties and

2   obligations that Participating Servicers, including Wells Fargo, must comply with "for all

3   mortgage loans it services, whether it services such mortgage loans for its own account or for

4   the account of another party, including any holders of mortgage-backed securities." *Id.* at

5   ¶2.A.

6    34.    Pursuant to the terms of the Servicer Participation Agreement, Wells Fargo

7   "wishes to participate in [HAMP] as a Participating Servicer on the terms and subject to the

8   conditions set forth herein." *Id.*

9    35.    Paragraph A of Part 1 of Wells Fargo's Servicer Participation Agreement,

10  entitled "Services," states in relevant part that:

> Servicer ***shall*** perform the loan modification and other foreclosure prevention
> services (collectively, the "Services") described in (i) the Financial Instrument
> attached hereto as Exhibit A (the "Financial Instrument"); (ii) the Program
> guidelines and procedures issued by the Treasury, including, without limitation,
> the net present value assessment requirements of the Program (the "Program
> Guidelines"); and (iii) any supplemental documentation, instructions, bulletins,
> letters, directives, or other communications, including, but not limited to,
> business continuity requirements, compliance requirements, performance
> requirements and related remedies, issued by the Treasury, Fannie Mae, or
> Freddie Mac in order to change, or further describe or clarify the scope of, the
> rights and duties of the Participating Servicers in connection with the Program.

17  Ex. A at ¶1(A) (bold and italics added).

18   36.    Wells Fargo's Servicer Participation Agreement also states:

> Servicer ***shall*** perform the Services for all mortgage loans it services, whether it
> services such mortgage loans for its own account or for the account of another
> party, including any holders of mortgage-backed securities (each such other
> party, an "Investor"). Servicer ***shall*** use reasonable efforts to remove all
> prohibitions or impediments to its authority, and use reasonable efforts to
> obtain all third party consents and waivers that are required, by contract or law,
> in order to effectuate any modification of a mortgage loan under [HAMP].

23  Ex. A at ¶2(A) (bold and italics added).

24   37.    In return for Wells Fargo's modification of eligible loans, the Servicer

25  Participation Agreement requires Fannie Mae to pay Wells Fargo, investors and eligible

26  borrowers certain sums up to a cap of $2.873 billion dollars for all of Wells Fargo's loan

27  modifications under the Servicer Participation Agreement. *See* Ex. A at ¶4(D).

28

BLOOD HURST & O'REARDON, LLP

1    38.    The Treasury's Summary of Guidelines for the Making Home Affordable

2  Program states that the overall program "*will offer assistance to as many as 7 to 9 million*

3  *homeowners*, making their mortgages more affordable and helping to prevent the destructive

4  impact of foreclosures on families, communities and the national economy.  Attached hereto as

5  Exhibit B is the Treasury's Summary of Guidelines.    According to the Summary of

6  Guidelines, HAMP "will help up to 3 to 4 million at-risk homeowners avoid foreclosure by

7  reducing monthly mortgage payments."  *Id.*

8                     **Wells Fargo's Obligations Pursuant to the HAMP Guidelines**

9    39.    Upon entering the SPA, loan servicers, including Wells Fargo, agreed to

10  perform the loan modifications in accordance with the guidelines set forth by the Treasury

11  Department.    In March 2009, the Treasury Department issued uniform guidance for loan

12  modifications across the mortgage industry and subsequently updated and expanded that

13  guidance in a series of policy announcements.

14    40.    Since HAMP's inception, Supplemental Directives were issued by the Treasury

15  Department, Fannie Mae, and Freddie Mac, supplementing and/or clarifying the original

16  obligations under the SPA, including:

| SD | Issue Date of SD | Effective Date of SD | Title of SD |
|---|---|---|---|
| 09-01 | April 6, 2009 | April 6, 2009 | Introduction to the Home Affordable Modification Program |
| 09-02 | April 21, 2009 | April 21, 2009 | Fair Housing Obligations Under the Home Affordable Modification Program |
| 09-03 | July 6, 2009 | July 6, 2009 | Trial Period Guidance |
| 09-04 | July 31, 2009 | September 1, 2009 | Home Price Decline Protection Incentives |
| 09-06 | September 11, 2009 | December 1, 2009 | Data Collection and Reporting Requirements Guidance |
| 09-07 | October 8, 2009 | October 8, 2009/ March 1, 2010 | Streamlined Borrower Evaluation Process |
| 09-08 | November 3, 2009 | January 1, 2010 | Borrower Notices |

BLOOD HURST & O'REARDON, LLP

| SD | Issue Date of SD | Effective Date of SD | Title of SD |
|----|------------------|----------------------|-------------|
| 09-10 | December 23, 2009 | December 23, 2009 | Temporary Review Period for Active Trial Modifications Scheduled to Expire on or before January 31, 2010 |
| 10-01 | January 28, 2010 | June 1, 2010 | Program Update and Resolution of Active Trial Modifications |
| 10-02 | March 24, 2010 | June 1, 2010 | Borrower Outreach and Communication |
| 10-04 | May 11, 2010 | August 1, 2010 | Home Affordable |

41.     In August, 2010, the Treasury Department issued the Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages (Version 2.0) (hereinafter "HAMP Handbook"). A copy of the HAMP Handbook is attached as Exhibit C. The HAMP Handbook sought to create a "consolidated resource for guidance related to the MHA Program for mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac." *See* Exhibit D, Supplemental Directive 10-09. "The Handbook incorporates and supersedes in their entirety Supplemental Directives 09-01, 09-02, 09-03, 09-04, 09-06, 09-07, 09-08, 09-10, 10-01, 10-02 and 10-04." *Id.* Further, to the extent there are any discrepancies or inconsistencies between the HAMP Handbook and the supplemental directives, the HAMP Handbook is controlling. *Id.* Accordingly, the mandates in the HAMP Handbook govern the obligations of Participating Servicers with respect to all loans they service. *Id.*; Exhibit C, at p. 6.

**Wells Fargo is Obligated to Initiate Loan Modifications**

42.     Under the SPA and the HAMP Handbook, Wells Fargo is obligated to create clear and comprehensive internal written policies for the identification and solicitation of borrowers potentially eligible for HAMP based on information in the servicer's (Wells Fargo's) possession. Ex. C, HAMP Handbook at §2.2.

43.     The HAMP Handbook mandates that if Wells Fargo's records indicate that a borrower has a first-lien mortgage and is two or more payments past due or unpaid, then Wells Fargo **must** pre-screen the mortgage to determine if it meets the following criteria: (a) the

BLOOD HURST & O'REARDON, LLP

subject property is a one-to-four unit residential property; (b) the subject property is occupied by the borrower as their principal residence; (c) the property is not vacated or condemned; (d) the loan was originated before January 1, 2009; (e) the unpaid principal balance ("UPB") does not exceed HAMP limits; and (f) the borrower has not been previously modified under HAMP. Ex. C, HAMP Handbook at §2.2. If the borrower meets these criteria, then Wells Fargo *must proactively solicit the borrower for HAMP*. *Id.*

44.     The HAMP application process may also be initiated when a borrower who is at risk of imminent default contacts Wells Fargo.

45.     The HAMP requirements mandate that Wells Fargo continue to make efforts to contact the borrower. Ex. C, HAMP Handbook at §2.2.1. If the borrower expresses an interest in HAMP, "the servicer must send a written communication to the borrower via regular or electronic mail that clearly describes the Initial Packet." *Id.* at §2.2.2. This communication must:

(a)     Describe the income evidence required to be evaluated for HAMP;

(b)     Provide a Request for Modification and Affidavit ("RMA") (or other proprietary financial information form substantially similar in content to the RMA and, if necessary, a Hardship Affidavit); and

(c)     Include an Internal Revenue Service (IRS) Form 4506T-EZ (or IRS Form 4506-T, if necessary).

*Id.*

46.     These documents are collectively referred to as the "Initial Packet." Ex. C, HAMP Handbook at §4. After this information is conveyed, it becomes the borrower's obligation to submit to Wells Fargo all information required in the Initial Packet. The purpose of the Initial Packet is to confirm that the borrower is in fact distressed and financially eligible to receive a modification.

**Wells Fargo is Required to Process Each Modification Applicant Through a Two Step Underwriting Process**

47.     After Wells Fargo collects the information in the Initial Packet, it screens the applicants through the HAMP underwriting process to determine: (a) the feasibility of the modification (referred to as the HAMP "waterfall" procedure); and (b) whether the value of

BLOOD HURST & O'REARDON, LLP

1    the modified loan exceeds the expected value of the loan were it not modified (the "Net

2    Present Value" test).

3        **A.    The HAMP "Waterfall Procedure"**

4        48.    Using the information provided by the borrowers in the Initial Packet, Wells

5    Fargo is required to determine the borrower's eligibility for a modification. *Id.* §6.   The

6    HAMP Waterfall procedure is a series of steps that the mortgage servicer must engage in order

7    to reduce the mortgage payment to the target level of affordability.

8        49.    The first step in the underwriting process is to determine the borrower's

9    Monthly Mortgage Payment ratio. In order to qualify for HAMP, "the ratio of the borrower's

10   current monthly mortgage payment to the monthly gross income of all borrowers on the

11   mortgage note" must be greater than 31 percent. Ex. C, HAMP Handbook at §6.1. That is, the

12   borrower must be spending more than 31% of their gross income on their mortgage payment.

13   If the ratio is less than 31%, the borrower is not eligible.  If the borrower's ratio exceeds 31%,

14   then Wells Fargo is required to apply HAMP's "waterfall procedure" to determine the terms of

15   the modification. *Id.* §6.3.

16       50.    The goal of the "waterfall procedure" is to reduce or modify the borrower's

17   monthly mortgage payment to make it equal to approximately 31% of their gross income. The

18   HAMP "waterfall procedure" is a series of steps participating servicers, including Wells Fargo,

19   must apply in order to achieve this reduction including, in summary, the following:

> To achieve the target monthly mortgage P&I payment amount, [the Participating Servicer must] complete each step in the order listed here, and proceed to the next one – only if needed, to reach the target 31% monthly mortgage payment ratio
>
> (a)     Capitalize accrued interest, escrow advances, and acceptable servicing advances to third parties by adding to loan balance (if allowed by applicable law);
>
> (b)     Reduce interest rate in .125% increments, to not less than 2%;
>
> (c)     Extend mortgage term by up to 480 months;
>
> (d)     Provide principal forbearance only if needed to reach 31% target

*See* Ex. C., HAMP Handbook §6.3.

BLOOD HURST & O'REARDON, LLP

1   51.    Once Wells Fargo, reaches the target monthly mortgage payment ratio (31%), it

2   has established the applicable modified scenario.

3   **B.    The Net Present Value ("NPV) Test**

4   52.    After the waterfall achieves the target payment ratio, the second step in the

5   underwriting process is to conduct the Net Present Value (NPV) test to determine if the loan is

6   still feasible under the modification scenario[1]. Ex. C, HAMP Handbook, §7.  The HAMP

7   Handbook provides:

8       All loans that meet HAMP eligibility criteria ... must be evaluated using a
9       standardized NPV test that compares the NPV result for a modification to the
        NPV result for no modification...  If the NPV result for the modification
10      scenario is greater than the NPV result for no modification, the result is deemed
        'positive' and the servicer must offer the modification.

11  *See* Ex. C, HAMP Handbook §7.

12  53.    The NPV test permits Wells Fargo to determine if the value of the modified

13  loan exceeds the value to Wells Fargo in proceeding with the un-modified loan.  The HAMP

14  guidelines mandate that Wells Fargo modify all NPV-positive loans to ensure that there is help

15  for all distressed borrowers when an objective test demonstrates the modification will benefit

16  both the borrower and the investor.  The program does not require Wells Fargo to modify the

17  loan if the modification tests negative, though Wells Fargo must consider other ways to

18  prevent foreclosure.

19  54.    The Treasury Department designed and implemented a model net present value

20  formula entitled, the "Base NPV model" specifically for HAMP. Participating Servicers are

21  required to use the Base NPV model to satisfy the HAMP guidelines mandating that all

22  eligible loans which test NPV positive are modified.  There are four primary components of

23  the NPV model: (a) Discount Rate; (b) Default Rate; (c) Home Price projections; and (d) REO

24  (foreclosed or real estate owned) Discount.

25

26  [1]     In general, NPV refers to the value today of a cash-generating investment – such as a
27  bond or mortgage loan.  When an investor is faced with a choice between two alternative
    investments – specifically, between the timing and amounts of the cash flows for each
28  investment – the investor obviously prefers the choice that has a higher present value. *See Ex.
    E,* HAMP Base NPV Model Specifications, June 11, 2009.

BLOOD HURST & O'REARDON, LLP

55.     Large Participating Servicers (those servicing mortgage assets in excess of 40 billion dollars), including Wells Fargo, are permitted limited discretion to design proprietary NPV models, which customize two of the four components: (a) Discount Rate, and (b) Default Rate. Wells Fargo is not permitted to adjust the other two components. *See* Ex. E at p. 2, HAMP Base NPV Model Specifications, June 11, 2009.

**Wells Fargo is Required to Complete the Underwriting Process and Approve the Borrowers' Application Prior to Accepting Trial Period Payments**

56.     After Wells Fargo determines that the borrower is eligible for the modification, and confirms the feasibility of the new loan modification terms through the waterfall procedure and the NPV test, Wells Fargo is required to provide the eligible borrower a "Trial Period Plan" ("TPP") contract offer.

57.     The Trial Period Plan is a three month period in which Wells Fargo offers the eligible borrower a modified mortgage payment that has been reduced in accordance with the modification criteria established in the HAMP Handbook. Wells Fargo utilizes a standard form Trial Period Plan agreement to offer the plans to all eligible borrowers. This TPP agreement sets forth the borrowers' obligations under the plan, and promises a permanent loan modification to the borrowers if the conditions of the Trial Period Plan agreement are met.

58.     At no time during the HAMP program was Wells Fargo permitted to accept *payments* under the Trial Period Plan until *after* the underwriting process described above was completed. Under the prior HAMP Guidelines, Wells Fargo was required to confirm underwriting and eligibility before the TPP was effective. Ex. F, Supplemental Directive 09-01, at 15. Under the current HAMP Guidelines, Wells Fargo is required to review all documentation, including the Initial Packet, within 30 days of receipt from the borrower (*see* Ex. C, HAMP Handbook §4.6), and it cannot make a Trial Period Plan offer until it has completed the underwriting process for the borrower.

59.     If, *after* the underwriting process, the borrower qualifies for HAMP, Wells Fargo *must* place the borrower in a Trial Period Plan ("TPP"). Ex. C, HAMP Handbook at §8; *see also* Ex. F, Supplemental Directive 09-01, at 15. Upon initiation, the TPP lasts three

BLOOD HURST & O'REARDON, LLP

1   months and is governed by the terms of the TPP Notice. Ex. C, HAMP Handbook at §8. The

2   amounts of the Trial Period Plan payments are "set at the target monthly mortgage ratio by

3   applying the standard waterfall as set forth in Section 6.3." *Id.* §8.3. Borrowers must keep all

4   Trial Period Plans "current" throughout the entire TPP. *Id.*

**Wells Fargo is Required to Offer All Borrowers that Complete the Trial
Payment Plan a Permanent Modification**

6

7   60.     Under HAMP's Guidelines, Wells Fargo is required to offer all borrowers who

8   made the TPP payments on a timely basis and who satisfy all other trial period requirements a

9   permanent modification: "Borrowers who make all trial period payments timely and who

10  satisfy all other trial period requirements will be offered a permanent modification." *See* Ex.

    C, HAMP Handbook at §8.

11  61.     The standardized Trial Period Plan agreement provides that if the borrower

12  satisfies the conditions precedent, then Wells Fargo will provide the borrower with a

13  permanent Loan Modification Agreement:

14

15      If I [Borrower] am in compliance with this Loan Trial Period and my
        representations in Section 1 continue to be true in all material respects, then the
16      Lender will provide me with a Loan Modification Agreement, as set forth in
        Section 3, that would amend and supplement (1) the Mortgage on the Property,
        and (2) the Note secured by the Mortgage.

17

*See* Exhibit G, "Home Affordable Modification Program; Loan Trial Period."

18

19  62.     Wells Fargo utilizes a uniform Trial Period Plan agreement to secure the

20  borrowers assent, and provides each eligible borrower the standardized, adhesionary Trial

    Period Plan agreements. Wells Fargo utilizes the model Trial Period Plan agreement form

21  published by Fannie Mae/Freddie Mac, "Uniform Instrument Form 3158."

22

23  63.     Consistent with the intended purpose of the HAMP program, Wells Fargo is

24  obligated to provide those borrowers who satisfy the conditions precedent of the Trial Period

    Plan agreement with permanent loan modifications.

25

**WELLS FARGO'S UNLAWFUL CONDUCT**

26

27  64.     Wells Fargo has routinely and systematically failed to meet its obligations

28  under the SPA. Wells Fargo has failed to comply with the HAMP Guidelines to process

BLOOD HURST & O'REARDON, LLP

1  requests for loan modifications in a timely manner and perform the underwriting calculations

2  to determine borrower eligibility for permanent modifications *prior to* accepting payments

3  made in accordance with the Trial Period Plan agreements.

4      65.    Instead, Wells Fargo, routinely and as a matter of custom and practice, accepted

5  multiple months of Trial Period Plan payments from borrowers only to subsequently reject the

6  borrowers' applications for reasons or conditions that were required to be vetted and satisfied

7  during the underwriting process. In so doing, Wells Fargo has violated the spirit and intent of

8  the Home Affordable Modification Program and breached the express terms of the SPA

9  agreement, which incorporates the HAMP Guidelines set forth in the Supplemental Directives

10  and the HAMP Handbook.

11      66.    The HAMP Handbook and the Trial Period Plan agreements provide limited,

12  specific conditions the borrower must continue to satisfy while engaged in the Trial Period

13  Plan. Wells Fargo routinely rejects borrowers and denies permanent loan modifications during

14  the Trial Period Plan time period for reasons that it was required to process, screen, and

15  acknowledge during the underwriting process and prior to issuing the TPP.

16      67.    By delaying and manipulating the underwriting process and rejecting applicants

17  after accepting their Trial Period Plans, Wells Fargo wrongfully accepted and retained money

18  from Plaintiff and Class members.

19      68.    The HAMP program criteria is skewed to generate applicants that are more

20  likely to test NPV positive, and produce more qualified modifications from eligible applicants

21  than it rejects. Despite its intention, HAMP has struggled to meet its objectives. This is due,

22  in large part, to unscrupulous mortgage servicers, including Wells Fargo, who engaged in

23  careful, yet calculated decisions to circumvent their obligations under the HAMP Guidelines to

24  game the system and improperly reject legitimate, qualified loan modification applicants.

25      69.    Participating Servicer accountability and servicer-specific results are reported

26  on a monthly basis. The report format includes the number of Trial Period Plans that have

27  transitioned to permanent modifications as well as a break-out of the 15 metropolitan areas

28  with the highest program activity. The MHA Monthly Servicer Performance Report through

BLOOD HURST & O'REARDON, LLP

1    August of 2009 established that Wells Fargo had one of the lowest percentages of trial

2    modifications started as a share of estimated eligible participants among all major servicers.

3    Despite initiating its HAMP participation in April of 2009, Wells Fargo had only started trial

4    modifications for 11% of its estimated 60+ day delinquencies. *See* Exhibit H at p.2 (Making

5    Home Affordable Program, Servicer Performance Report Through August, 2009).

6    　　　70.　　The MHA Servicer Performance Report Through September, 2010 provides

7    further evidence of Wells Fargo's abysmal performance and underscores its failure to serve the

8    objectives of HAMP, and honor its commitment to assist distressed borrowers. Through

9    September of 2010, Wells Fargo had converted only 28% of all trial modifications into

10   permanent modifications. *See* Exhibit I at p.5 (Making Home Affordable Program, Servicer

11   Performance Report Through September 2010). This, despite the Guidelines' partiality to

12   modification.

13   　　　　　　　　　　　　　**PLAINTIFF CORVELLO**

14   　　　71.　　In September 2007, plaintiff closed escrow on a home in Fairfield, California.

15   In connection with his purchase, plaintiff secured a mortgage from Wells Fargo.

16   　　　72.　　On or about the beginning of May 2009, plaintiff contacted Wells Fargo and

17   informed Wells Fargo that it was unlikely he could remain current on his mortgage payments.

18   At that time Wells Fargo refused to discuss foreclosure options, including Trial Period Plans

19   under HAMP. In May and June 2009, plaintiff did not make his monthly mortgage payments.

20   　　　73.　　On May 27, 2009, Wells Fargo sent plaintiff information regarding possible

21   mortgage solutions and how to request assistance. *See* Exhibit J attached hereto (May 27,

22   2009, letter from Wells Fargo).

23   　　　74.　　On June 25, 2009, Wells Fargo sent plaintiff a "Financial Worksheet," that

24   plaintiff completed and on or before July 10, 2009, returned to Wells Fargo with a financial

25   hardship letter and three of his paystubs.

26   　　　75.　　On July 17, 2009, Wells Fargo sent plaintiff a standard form letter stating, "You

27   may qualify for a Home Affordable Modification Trial Period Plan – a way to make your

28   payment more affordable." Exhibit K attached hereto (July 17, 2009, Wells Fargo offer).

BLOOD HURST & O'REARDON, LLP

1      According to Wells Fargo's July 17, 2009 offer letter, if plaintiff "qualif[ied] under the federal

2      government's Home Affordable Modification program and compl[ied] with the terms of the

3      Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure." *Id.*

4      Plaintiff was told to "Act Now!" and that "To accept this offer, and see if you qualify for a

5      Home Affordable Modification, send the 5 items listed below … not later than 08/16/2009."

6      *Id.* at 2 (Instructing plaintiff to send: (1) two copies of the signed Trial Period Plan; (2) his first

7      month's Trial Period Plan; (3) the enclosed Hardship Affidavit completed and signed; (4) a

8      signed and dated copy of his tax return; and (5) specified documentation to verify his income).

9          76.     Plaintiff timely complied with all of the requirements of the July 17, 2009,

10     letter, providing the required income verification statement and (notably) sent his first Trial

11     Period Plan.

12          77.     According to the July 17, 2009 offer, plaintiff's "remaining Trial Period Plans

13     set forth in the Trial Period Plan will be due on or before 10/1/2009 and 11/1/2009. These

14     payments should be sent instead of, not in addition to, your normal monthly mortgage

15     payment." *Id.* at 2.

16          78.     On August 9, 2009, plaintiff signed the standard form Loan Trial Period

17     agreement (the "Agreement") that was included with Wells Fargo's letter dated July 17, 2009.

18     Ex. E attached hereto. Pursuant to the Agreement, plaintiff made various attestations,

19     including that he was unable to afford his mortgage payments, and that he provided

20     documentation for all income he received. In reliance on Wells Fargo's modification offer

21     terms in its July 17, 2009 offer letter, plaintiff agreed to make Trial Period Plan payments of

22     $2,185.22 on August 16, 2009, October 1, 2009, and November 1, 2009. *Id.* at 2. According

23     to the signed Agreement, plaintiff's trial period commenced on the date of the plan (specified

24     as August 16, 2009) and ended on the earlier of: the first day of the month following the month

25     in which the last Trial Period Plan payment was due, or termination of the plan. *Id.*

26          79.     Plaintiff timely submitted the required HAMP documentation and all three of

27     his Trial Period Plan payments.

28

BLOOD HURST & O'REARDON, LLP

1    80.    Although plaintiff complied with all requirements, including timely submitting

2    all three of his Trial Period Plan payments, Wells Fargo never offered him a permanent

3    mortgage modification.

4                            **CLASS ACTION ALLEGATIONS**

5    81.    Plaintiff brings this lawsuit on behalf of himself and the proposed Class

6    members under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure.  The proposed

7    Class consists of:

8        All persons in the United States at any time up to the date notice is provided to
         the Class whose residential mortgage loans were serviced by Wells Fargo, and
9        who, pursuant to HAMP, were eligible for a loan modification, but were not
         offered a trial period plan, or participated in a trial period plan and made trial
10       period plan payments, but were not offered a permanent loan modification.

11   Excluded from the Class is Wells Fargo and any of its officers, directors and employees.

12   82.    ***Numerosity***.  The members of the Class are so numerous that their individual

13   joinder is impracticable.  Plaintiff is informed and believes, and on that basis alleges, that the

14   proposed Class contains hundreds of thousands of members.  The precise number of Class

15   members is unknown to plaintiff.  The true number of Class members is known by the

16   defendant, however, and thus, may be notified of the pendency of this action by first class

17   mail, electronic mail, and by published notice.

18   83.    ***Existence and Predominance of Common Questions of Law and Fact.***

19   Common questions of law and fact exist as to all members of the Class and predominate over

20   any questions affecting only individual Class members.  These common legal and factual

21   questions include, but are not limited to, the following:

22       (a)    whether Wells Fargo's alleged conduct violates public policy;

23       (b)    whether the alleged conduct constitutes violations of the laws asserted

24   herein;

25       (c)    whether plaintiff and Class members have sustained monetary loss and

26   the proper measure of that loss;

27       (d)    whether plaintiff and Class members are entitled to an award of punitive

28   damages; and

BLOOD HURST & O'REARDON, LLP

00023458    CLASS ACTION COMPLAINT                                    19

1          (e)     whether plaintiff and Class members are entitled to declaratory and

2    injunctive relief.

3          84.    **Typicality**.  Plaintiff's claims are typical of the claims of the members of the

4    Class in that he is a member of the Class he seeks to represent.

5          85.    **Adequacy of Representation**.  Plaintiff will fairly and adequately protect the

6    interests of the members of the Class.  Plaintiff has retained counsel highly experienced in

7    complex consumer class action litigation, and plaintiff intends to prosecute this action

8    vigorously.  Plaintiff has no adverse or antagonistic interests to those of the Class.

9          86.  '  **Superiority**.  A class action is superior to all other available means for the fair

10   and efficient adjudication of this controversy.   The damages or other financial detriment

11   suffered by individual Class members is relatively small compared to the burden and expense

12   that would be entailed by individual litigation of their claims against the defendant.

13   Individualized litigation would create the danger of inconsistent or contradictory judgments

14   arising from the same set of facts.  Individualized litigation would also increase the delay and

15   expense to all parties and the court system from the issues raised by this action.  Further, the

16   adjudication of this action presents no unusual management difficulties.

17         87.    Adequate notice can be given to Class members directly using information

18   maintained in defendant's records or through notice by publication.

19         88.    Damages may be calculated, in part, from the mortgage information maintained

20   in defendant's records, so that the cost of administering a recovery for the Class can be

21   minimized.  However, the precise amount of damages available to plaintiff and the other

22   members of the Class is not a barrier to class certification.

23         89.    Unless a class is certified, defendant will retain monies received as a result of

24   its conduct that was taken from plaintiff and proposed Class members.  Unless a classwide

25   injunction is issued, defendant will continue to commit the violations alleged, and the

26   members of the Class will continue to be misled and denied their rights.

27

28

BLOOD HURST & O'REARDON, LLP

BLOOD HURST & O'REARDON, LLP

**COUNT I**

**Breach of Contract (Breach of the Trial Period Plan Agreement)**

90.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

91.     Plaintiff brings this claim individually and on behalf of the Class.

92.     Plaintiff and Class members directly contracted with Wells Fargo for loan modifications:  Plaintiff and members of the Class on one hand, and Wells Fargo on the other, entered into a written, standard form loan modification contract.  *See* Ex. E (the signed Trial Period Plan Agreement).  Pursuant to the loan modification contract, if plaintiff and Class members complied with Wells Fargo's contractual offer "then [Wells Fargo] will provide me with a Loan Modification Agreement." *Id.*

93.     Plaintiff and Class members complied with the terms of Wells Fargo's contractual offer.  Plaintiff and the Class members satisfied all conditions precedent of Wells Fargo's contract offer, including: (a) maintaining the representations made in Section 1 of the Trial Period Plan Agreement; and (b) making the full loan Trial Period Plan Agreement payments in a timely manner.

94.     Wells Fargo breached the contract by failing to perform its loan obligations, including offering plaintiff and Class members a permanent loan modification.

**COUNT II**

**Breach of Contract (Third Party Beneficiary – Breach of the TPA)**

95.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

96.     Plaintiff brings this claim individually and on behalf of the Class.

97.     Plaintiff and Class members are third-party beneficiaries of Wells Fargo's contractual obligations: Plaintiff and Class members are also intended third-party beneficiaries to Wells Fargo's Servicer Participation Agreement (SPA) – a written contract between Wells Fargo and the Treasury Department.

98. As described above, Wells Fargo and the Treasury Department intended that plaintiff and Class members benefit under the written Servicer Participation Agreement.

99. Wells Fargo breached the contract (Servicer Participation Agreement) by failing to perform its loan modification obligations in accordance with the HAMP Guidelines and as described above.

100. As a direct and proximate result of Wells Fargo's breach of contract – both the direct loan modification contract, and the Servicer Participation Agreement contract – plaintiff and Class members have been damaged in amounts to be proven at trial, and continue to be damaged.

101. All conditions precedent to defendant's obligations under the contracts have occurred or been performed.

## COUNT III

### Breach of Contract (Promissory Estoppel)

102. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

103. Wells Fargo communicated an offer to Plaintiff and members of the Class to provide them with a permanent HAMP loan modification if they, in return, executed the Trial Period Plan agreement and satisfied two conditions precedent: (a) the information they provided regarding their income and eligibility for the loan modification remained accurate during the time period governed by the Trial Period Plan; and (b) they make the Trial Period Plan payments.

104. Wells Fargo's representations and the TPP agreement were intended to induce Plaintiff and members of the Class to rely upon them, to sign or acknowledge the TPP agreement and to make TPP payments.

105. Plaintiff and members of the Class did in fact rely on Wells Fargo's representations by acknowledging the TPP agreements and submitting payments to Wells Fargo consistent with the terms of the TPP agreements.

BLOOD HURST & O'REARDON, LLP

106.   Given the mandate of the HAMP program, the charter of the Treasury Department to enact and provide for the regulation of the program, and Wells Fargo's participation in the program, the notoriety of the program and the intention of the program to assist distressed borrowers in securing permanent mortgage loan modifications, Plaintiff's and the Class members' reliance on Wells Fargo's representations and contract offer were reasonable.

107.   Plaintiff and members of the Class relied upon Wells Fargo's representations to their detriment and have not been offered permanent loan modifications.   Plaintiff and members of the Class lost money and the opportunity to engage other remedies, solutions or strategies to effectuate a resolution to their mortgage payment difficulties.

## COUNT IV

### Breach of the Implied Covenant of Good Faith and Fair Dealing

108.   Plaintiff hereby incorporates all paragraphs above as though fully set forth herein.

109.   In all contracts, including the contracts between the plaintiff and Class members on the one hand, and Wells Fargo on the other, there is an implied covenant of good faith and fair dealing requiring the parties to deal fairly with each other in all respects in connection with the contracts, and not to take any action which deprives of the other of the benefits of the contracts to any extent.

110.   The covenants of good faith and fair dealing include obligations, on the part of Wells Fargo to extend loan modification offers to eligible borrowers.  Wells Fargo breached the covenants of good faith and fair dealing in the contracts by charging and collecting Trial Period Plan payments from Class members, but never extending permanent loan modification offers. As a direct and proximate result of Wells Fargo's breach, plaintiff and the other Class members have been damaged in amounts to be proven at trial, and continue to be damaged.

BLOOD HURST & O'REARDON, LLP

BLOOD HURST & O'REARDON, LLP

1

**COUNT V**

2

**Violations of the Business & Professions Code §17200, *et seq.***

3       111.   Plaintiff repeats and re-alleges the allegations contained in the paragraphs

4   above, as if fully set forth herein.

5       112.   Business and Professions Code §17200 prohibits any "unfair, deceptive, untrue

6   or misleading advertising." For the reasons discussed above, Wells Fargo has engaged in

7   unfair, deceptive, untrue and misleading advertising in violation of Business & Professions

8   Code §17200.

9       113.   Business & Professions Code §17200 also prohibits any "unlawful ... business

10  act or practice." Wells Fargo has violated §17200's prohibition against engaging in unlawful

11  acts and practices by, *inter alia*, making the representations and omissions of material facts, as

12  set forth more fully herein, and violating Civil Code §§1572, 1573, 1709, 1710, 1711, 1770,

13  Business & Professions Code §17200 *et seq.*, HAMP, the California Foreclosure Prevention

14  Act, and the common law.

15      114.   Plaintiff and the Class reserve the right to allege other violations of law which

16  constitute other unlawful business acts or practices. Such conduct is ongoing and continues to

17  this date.

18      115.   Business & Professions Code §17200 also prohibits any "unfair ... business act

19  or practice."

20      116.   Wells Fargo's acts, omissions, misrepresentations, practices and non-

21  disclosures as alleged herein also constitute "unfair" business acts and practices within the

22  meaning of Business & Professions Code §17200, *et seq.* in that its conduct is substantially

23  injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and

24  unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such

25  conduct.

26      117.   In addition to the deceitful conduct, Wells Fargo's immoral and unscrupulous

27  practices include: (a) failing to provide permanent loan modification offers to Class members

28  despite direct contractual promises and obligations; (b) failing to provide permanent loan

1    modification offers to Class members despite the public policies behind HAMP, to which
2    Wells Fargo is a signatory, wherein Wells Fargo is required to service all eligible loans under
3    the rules of HAMP so at-risk borrowers, including Class members, can better afford their
4    mortgage payments; (c) failing to offer eligible Class members Trial Period Plans under
5    HAMP; (d) improperly collecting Trial Period Plan payments before completing the
6    underwriting process to determine whether Plaintiff and Class members were indeed eligible
7    for permanent loan modifications; (e) collecting Trial Period Plan payments from plaintiff and
8    Class members with knowledge that they were not eligible for a permanent loan modification;
9    (f) improperly rejecting Plaintiff and Class members for reasons or conditions that were
10   required to satisfied, excused or otherwise discharged prior to collecting the TPP payments;
11   and (g) manipulating its proprietary NPV formula and/or data inputs to include criteria which
12   resulted in the improper denial of permanent loan modifications.

13   118.   As stated in this Complaint, plaintiff alleges violations of consumer protection,
14   unfair competition and truth in advertising laws in California and other states resulting in harm
15   to consumers.   Plaintiff asserts violation of the public policy of engaging in false and
16   misleading advertising, unfair competition and deceptive conduct towards consumers.   This
17   conduct constitutes violations of the unfair prong of Business & Professions Code §17200, *et*
18   *seq.*

19   119.   There were reasonably available alternatives to further Wells Fargo's legitimate
20   business interests, other than the conduct described herein.

21   120.   Business & Professions Code §17200 also prohibits any "fraudulent business
22   act or practice."

23   121.   Wells Fargo's claims, nondisclosures and misleading statements, as more fully
24   set forth above, were false, misleading and/or likely to deceive the consuming public
25   within the meaning of Business & Professions Code §17200.

26   122.   Wells Fargo's conduct caused and continues to cause substantial injury to
27   plaintiff and the other Class members. Plaintiff has suffered injury in fact and has lost money
28   as a result of Wells Fargo's unfair conduct.

BLOOD HURST & O'REARDON, LLP

BLOOD HURST & O'REARDON, LLP

1    123.    Wells Fargo has thus engaged in unlawful, unfair and fraudulent business acts

2  and practices and false advertising, entitling plaintiff to judgment and equitable relief against

3  defendant, as set forth in the Prayer for Relief.

4    124.    Additionally, pursuant to Business & Professions Code §17203, plaintiff

5  seeks an order and injunction requiring Wells Fargo to immediately cease such acts of

6  unlawful, unfair and fraudulent business practices.

7                                  **COUNT VI**

8                               **Declaratory Relief**

9    125.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs

10  above, as if fully set forth herein.

11    126.    Pursuant to HAMP, the express and implied contracts, and all other duties and

12  obligations of the parties as explained above, an actual controversy has arisen and now exists

13  regarding plaintiff's rights, and defendant's obligations, relating to its practice of not offering

14  Trial Period Plans to eligible borrowers, and charging and collecting Trial Period Plan

15  payments from plaintiff and certain Class members, but never extending permanent HAMP

16  loan modification offers.

17    127.    Plaintiff requests a judicial determination of his rights and duties, and the rights

18  and duties of absent Class members. A declaration from the Court ordering defendant to stop

19  its illegal practices is required.

20                                **PRAYER FOR RELIEF**

21    Wherefore, plaintiff prays for a judgment:

22    A.    Certifying the Class as requested herein;

23    B.    Awarding plaintiff and the proposed Class members damages;

24    C.    Awarding restitution and disgorgement of Wells Fargo's revenues to plaintiff

25  and the proposed Class members;

26    D.    Awarding declaratory and injunctive relief as permitted by law or equity,

27  including enjoining defendant from continuing the unlawful practices as set forth herein, and

28  directing defendant to identify, with Court supervision, victims of its conduct and pay them

1   restitution and disgorgement of all monies acquired by defendant by means of any act or

2   practice declared by this Court to be wrongful;

3       E.      Awarding plaintiff and the Class punitive damages;

4       F.      Awarding attorneys' fees and costs; and

5       G.      Providing such further relief as may be just and proper.

6                                  **JURY DEMAND**

7       Plaintiff demands a trial by jury on all issues so triable.

8   Dated: November 9, 2010            BLOOD HURST & O'REARDON, LLP
                                       TIMOTHY G. BLOOD (149343)
9                                      LESLIE E. HURST (178432)
                                       THOMAS J. O'REARDON II (247952)
10

11                                     By: _____
                                              TIMOTHY G. BLOOD
12

13                                     600 B Street, Suite 1550
                                       San Diego, CA 92101
14                                     Telephone: 619/338-1100
                                       619/338-1101 (fax)
15                                     tblood@bholaw.com
                                       lhurst@bholaw.com
16                                     toreardon@bholaw.com

17                                     HARRISON PATTERSON & O'CONNOR LLP
                                       JAMES R. PATTERSON (211102)
18                                     ALISA A. MARTIN (224037)
                                       402 West Broadway, 29th Floor
19                                     San Diego, CA 92101
                                       Telephone: 619/756-6990
20                                     619/756-6991 (fax)
                                       jpatterson@hpolaw.com
21                                     amartin@hpolaw.com

22                                     BONNETT FAIRBOURN FRIEDMAN
                                       & BALINT, PC
23                                     TODD D. CARPENTER (234463)
                                       600 West Broadway Suite 900
24                                     San Diego, CA 92101
                                       Telephone: 619/756-6978
25                                     (602)2741199 (fax)
                                       tcarpenter@bffb.com

26

27

28

BLOOD HURST & O'REARDON, LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BONNETT FAIRBOURN FRIEDMAN
& BALINT, PC
ANDREW S. FRIEDMAN (AZ005425)
ELAINE A. RYAN (AZ 012870)
PATRICIA N. SYVERSON (CA 203111)
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012-3311
Telephone: 602/274-1100
602/798-5860 (fax)
afriedman@bffb.com
eryan@bffb.com
psyverson@bffb.com

Attorneys for Plaintiff

BLOOD HURST & O'REARDON, LLP

CLASS ACTION COMPLAINT

# EXHIBIT A

## COMMITMENT TO PURCHASE FINANCIAL INSTRUMENT
### and
### SERVICER PARTICIPATION AGREEMENT
### for the
### HOME AFFORDABLE MODIFICATION PROGRAM
### under the
### EMERGENCY ECONOMIC STABILIZATION ACT OF 2008

This Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment") is entered into as of the Effective Date, by and between Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae"), and the undersigned party ("Servicer"). Capitalized terms used, but not defined contextually, shall have the meanings ascribed to them in Section 12 below.

### Recitals

WHEREAS, the U.S. Department of the Treasury (the "Treasury") has established a Home Affordable Modification Program (the "Program") pursuant to section 101 and 109 of the Emergency Economic Stabilization Act of 2008 (the "Act"), as section 109 of the Act has been amended by section 7002 of the American Recovery and Reinvestment Act of 2009;

WHEREAS, the Program includes loan modification and other foreclosure prevention services;

WHEREAS, Fannie Mae has been designated by the Treasury as a financial agent of the United States in connection with the implementation of the Program;

WHEREAS, Fannie Mae will, in its capacity as a financial agent of the United States, fulfill the roles of administrator, record keeper and paying agent for the Program, and in conjunction therewith must standardize certain mortgage modification and foreclosure prevention practices and procedures as they relate to the Program, consistent with the Act and in accordance with the directives of, and guidance provided by, the Treasury;

WHEREAS, Federal Home Loan Mortgage Corporation ("Freddie Mac") has been designated by the Treasury as a financial agent of the United States and will, in its capacity as a financial agent of the United States, fulfill a compliance role in connection with the Program; all references to Freddie Mac in the Agreement shall be in its capacity as compliance agent of the Program;

WHEREAS, all Fannie Mae and Freddie Mac approved servicers are being directed through their respective servicing guides and bulletins to implement the Program with respect to mortgage loans owned, securitized, or guaranteed by Fannie Mae or Freddie Mac (the "GSE Loans"); accordingly, this Agreement does not apply to the GSE Loans;

WHEREAS, all other servicers, as well as Fannie Mae and Freddie Mac approved servicers, that wish to participate in the Program with respect to loans that are not GSE Loans (collectively, "Participating Servicers") must agree to certain terms and conditions relating to the respective roles and responsibilities of Program participants and other financial agents of the government; and

WHEREAS, Servicer wishes to participate in the Program as a Participating Servicer on the terms and subject to the conditions set forth herein.

Accordingly, in consideration of the representations, warranties, and mutual agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Fannie Mae and Servicer agree as follows.

**Agreement**

**1. Services**

A.      Subject to Section 10.C., Servicer shall perform the loan modification and other foreclosure prevention services (collectively, the "Services") described in (i) the Financial Instrument attached hereto as Exhibit A (the "Financial Instrument"); (ii) the Program guidelines and procedures issued by the Treasury, including, without limitation, the net present value assessment requirements of the Program (the "Program Guidelines"); and (iii) any supplemental documentation, instructions, bulletins, letters, directives, or other communications, including, but not limited to, business continuity requirements, compliance requirements, performance requirements and related remedies, issued by the Treasury, Fannie Mae, or Freddie Mac in order to change, or further describe or clarify the scope of, the rights and duties of the Participating Servicers in connection with the Program (the "Supplemental Directives" and, together with the Program Guidelines, the "Program Documentation").  The Program Documentation will be available to all Participating Servicers at www.financialstability.gov. The Program Documentation, as the same may be modified or amended from time to time in accordance with Section 10 below, is hereby incorporated into the Commitment by this reference.

B.      Servicer's representations and warranties, and acknowledgement of and agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Program and under the Agreement are set forth in the Financial Instrument. Servicer's certification as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided annually in the form attached hereto as Exhibit B (the "Annual Certification"), beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term (as defined below).

C.      The recitals set forth above are hereby incorporated herein by this reference.

**2. Authority and Agreement to Participate in Program**

A.      Servicer shall perform the Services for all mortgage loans its services, whether it services such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities (each such other party, an "Investor").  Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any modification of a mortgage loan under the Program.

B.      Notwithstanding subsection A., if (x) Servicer is unable to obtain all necessary consents and waivers for modifying a mortgage loan, or (y) the pooling and servicing agreement or other similar servicing contract governing Servicer's servicing of a mortgage loan prohibits Servicer from performing the Services for that mortgage loan, Servicer shall not be required to perform the Services with respect to that mortgage loan and shall not receive all or any portion of the Purchase Price (as defined below) otherwise payable with respect to such loan.

C.      Notwithstanding anything to the contrary contained herein, the Agreement does not apply to GSE Loans.  Servicers are directed to the servicing guides and bulletins issued by Fannie Mae and Freddie Mac, respectively, concerning the Program as applied to GSE Loans.

D.      Servicer's performance of the Services and implementation of the Program shall be subject to review by Freddie Mac and its agents and designees as more fully set forth in the Agreement.

**3. Set Up; Prerequisite to Payment**

Servicer will provide to Fannie Mae: (a) the set up information required by the Program Documentation and any ancillary or administrative information requested by Fannie Mae in order to process Servicer's participation in the Program as a Participating Servicer on or before the Effective Date of the Commitment; and (b) the data elements for each mortgage eligible for the Program

as and when described in the Program Documentation and the Financial Instrument. Purchase Price payments will not be remitted pursuant to Section 4 with respect to any modified mortgage for which the required data elements have not been provided.

## 4. Agreement to Purchase Financial Instrument; Payment of Purchase Price

A. Fannie Mae, in its capacity as a financial agent of the United States, agrees to purchase, and Servicer agrees to sell to Fannie Mae, in such capacity, the Financial Instrument that is executed and delivered by Servicer to Fannie Mae in the form attached hereto as Exhibit A, in consideration for the payment by Fannie Mae, as agent, of the Purchase Price (defined below). The conditions precedent to the payment by Fannie Mae of the Purchase Price are: (a) the execution and delivery of the Commitment and the Financial Instrument by Servicer to Fannie Mae; (b) the execution and delivery by Fannie Mae of the Commitment to Servicer; (c) the delivery of copies of the fully executed Commitment and Financial Instrument to Treasury on the Effective Date; (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.

B. Solely in its capacity as the financial agent of the United States, and subject to subsection C. below, Fannie Mae shall: (i) remit compensation payments to Servicer; (ii) remit incentive payments to Servicer for the account of Servicer and for the credit of borrowers under their respective mortgage loan obligations; and (iii) remit payments to Servicer for the account of Investors, in each case in accordance with the Program Documentation (all such payments, collectively, the "Purchase Price"); all payments remitted to Servicer for the credit of borrowers or for the account of Investors under the Program Documentation shall be applied by Servicer to the borrowers' respective mortgage loan obligations, or remitted by Servicer to Investors, as required by the Program Documentation. Fannie Mae shall have no liability to Servicer with respect to the payment of the Purchase Price, unless and until: (a) Servicer and all other interested parties have satisfied all pre-requisites set forth herein and in the Program Documentation relating to the Program payment structure, including, but not limited to, the delivery of all data elements required by Section 3 of this Commitment; and (b) the Treasury has provided funds to Fannie Mae for remittance to Servicer, together with written direction to remit the funds to Servicer in accordance with the Program Documentation.

C. The Purchase Price will be paid to Servicer by Fannie Mae as the financial agent of the United States as and when described herein and in the Program Documentation in consideration for the execution and delivery of the Financial Instrument by Servicer on or before the Effective Date of the Agreement, upon the satisfaction of the conditions precedent to payment described in subsections A. and B. above.

D. The value of the Agreement is limited to $2,873,000,000 (the "Program Participation Cap"). Accordingly, the aggregate Purchase Price payable to Servicer under the Agreement may not exceed the amount of the Program Participation Cap. For each loan modification that becomes effective, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be reduced by the maximum Purchase Price potentially payable with respect to that loan modification. In the event the Purchase Price actually paid with respect to that loan modification is less than the maximum Purchase Price potentially payable, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be increased by the difference between such amounts. Notwithstanding the foregoing, no agreements with borrowers intended to result in new loan modifications will be effected under the Agreement, and no payments will be made with respect to any new loan modifications from and after the date on which the aggregate Purchase Price paid or payable to Servicer under the Agreement equals the Program Participation Cap. Treasury may, from time to time in its sole discretion, adjust the amount of the Program Participation Cap. Servicer will be notified of all adjustments to the Program Participation Cap in writing by Fannie Mae.

E. Servicer shall maintain complete and accurate records of, and supporting documentation for, the borrower payment, including, but not limited to, PITIA (principal, interest, taxes, insurance (including homeowner's insurance and hazard and flood insurance) and homeowner's association and/or condo fees), and delinquency information and data provided to Fannie Mae regarding each agreement relating to a trial modification period and each loan modification agreement executed under the Program, which will be relied upon by Fannie Mae when calculating, as financial agent for the United States, the Purchase Price to be paid by the Treasury through Fannie Mae or any other financial agent. Servicer agrees to provide Fannie Mae and Freddie Mac with documentation and

- 3 -

other information with respect to any amounts paid by the Treasury as may be reasonably requested by such parties. In the event of a discrepancy or error in the amount of the Purchase Price paid hereunder, at Fannie Mae's election, (x) Servicer shall remit to Fannie Mae the amount of any overpayment within thirty (30) days of receiving a refund request from Fannie Mae, or (y) Fannie Mae may immediately offset the amount of the overpayment against other amounts due and payable to Servicer by Fannie Mae, as financial agent of the United States, upon written notice to Servicer. Servicer shall still be obligated to credit to the respective mortgage loan obligations of borrowers, and to the respective accounts of Investors, any portion of the Purchase Price to which they are entitled (if any) notwithstanding such offset unless otherwise directed by Fannie Mae.

F.  At the election and upon the direction of the Treasury and with prior written notice to Servicer, Fannie Mae may deduct from any amount to be paid to Servicer any amount that Servicer, Investor, or borrower is obligated to reimburse or pay to the United States government, provided, however, that any amount withheld under this subsection F. will be withheld only from the amounts payable to, or for the account or credit of, the party which is liable for the obligation to the United States government.

G.  In the event that the Agreement expires or is terminated pursuant to Section 5 or Section 6, and subject to Fannie Mae's rights under Section 6, Fannie Mae shall, solely in its capacity as the financial agent of the United States, continue to remit all amounts that are properly payable pursuant to subsection A. above to Servicer in accordance with the Program Documentation until paid in full, provided, however, that Purchase Price payments will be made only with respect to qualifying mortgage loan modifications that were submitted by Servicer and accepted by Fannie Mae for inclusion in the Program in accordance with the Program Documentation prior to the date of expiration or termination and that do not exceed the Program Participation Cap.

H.  Notwithstanding anything to the contrary contained in subsection G. above, in the event that the Agreement is terminated pursuant to Section 6 B. in connection with an Event of Default by Servicer under Section 6 A., no compensation with respect to any loan will be paid to Servicer for the account of the Servicer subsequent to termination; subject to Fannie Mae's rights under Section 6, Fannie Mae's only continuing obligations as financial agent of the United States subsequent to termination will be to remit payments to Servicer (or, at Fannie Mae's discretion, an alternative provider) for the account of borrowers and Investors, as provided in the Agreement.

I.  Notwithstanding anything to the contrary contained in subsection F. above, in the event that the Agreement is terminated pursuant to Section 6 C. in connection with an Event of Default by an Investor or a borrower under Section 6 A., no compensation with respect to any loan will be paid to Servicer for the credit or account of the defaulting party subsequent to termination; subject to Fannie Mae's rights under Section 6, Fannie Mae's only continuing obligations as financial agent of the United States subsequent to termination will be to remit payments to Servicer for the credit or account of non-defaulting parties as described in the Program Documentation.

J.  Notwithstanding anything to the contrary contained herein, Fannie Mae, in its capacity as the financial agent of the United States, may reduce the amounts payable to Servicer under Section 4.B., or obtain repayment of prior payments made under Section 4.B., in connection with an Event of Default by Servicer or in connection with an evaluation of performance that includes any specific findings by Freddie Mac that Servicer's performance under any performance criteria established pursuant to the Program Documentation is materially insufficient; provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4.B. only with respect to loan modifications that are determined by Fannie Mae or Freddie Mac to have been impacted by, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted, by the Event of Default or findings giving rise to this remedy. These remedies are not exclusive; they are available in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

K.  Notwithstanding anything to the contrary contained herein, Fannie Mae, in its capacity as the financial agent of the United States, may reduce the amounts payable to Servicer for the credit or account of an Investor or a borrower under Section 4.B., or obtain repayment of prior payments made for the credit or account of such parties under Section 4.B., in connection with an Event of Default by an Investor or a borrower. Servicer will reasonably cooperate with, and provide reasonable support and assistance to, Fannie Mae and Freddie Mac in connection with their respective roles and, in Fannie Mae's case, in connection with its efforts to obtain repayment of prior payments made to Investors and borrowers as provided in this subsection. These remedies are not

exclusive; they are available in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

## 5. Term

A. Qualifying mortgage loans may be submitted by Servicer and accepted by Fannie Mae as described in the Financial Instrument and the Program Documentation from and after the Effective Date until December 31, 2012 (the "Initial Term"), subject to Program extensions by the Treasury or earlier termination of the Agreement by Fannie Mae pursuant to the provisions hereof or suspension or termination of the Program by the Treasury, provided, however, no new qualifying mortgage loans may be submitted by Servicer or accepted by Fannie Mae from and after the date on which the Program Participation Cap is reached.

B. Servicer shall perform the Services described in the Program Documentation in accordance with the terms and conditions of the Agreement during the Initial Term and any extensions thereof (the Initial Term, together with all extensions thereof, if any, the "Term"), and during such additional period as may be necessary to: (i) comply with all data collection, retention and reporting requirements specified in the Program Documentation during and for the periods set forth therein; and (ii) complete all Services that were initiated by Servicer, including, but not limited to, mortgage modifications and the completion of all documentation relating thereto, during the Term. Servicer agrees that it will work diligently to complete all Services as soon as reasonably possible after the end of the Term or earlier termination.

C. The Agreement may be terminated by Fannie Mae or Servicer prior to the end of the Term pursuant to Section 6 below.

## 6. Defaults and Early Termination

A. The following constitute events of default under the Agreement (each, an "Event of Default" and, collectively, "Events of Default"):

(1) Servicer fails to perform or comply with any of its material obligations under the Agreement, including, but not limited to, circumstances in which Servicer fails to ensure that all eligibility criteria and other conditions precedent to modification specified in the Program Documentation are satisfied prior to effectuating modifications under the Program.

(2) Servicer: (a) ceases to do business as a going concern; (b) makes a general assignment for the benefit of, or enters into any arrangement with creditors in lieu thereof; (c) admits in writing its inability to pay its debts as they become due; (d) files a voluntary petition under any bankruptcy or insolvency law or files a voluntary petition under the reorganization or arrangement provisions of the laws of the United States or any other jurisdiction; (e) authorizes, applies for or consents to the appointment of a trustee or liquidator of all or substantially all of its assets; (f) has any substantial part of its property subjected to a levy, seizure, assignment or sale for or by any creditor or governmental agency; or (g) enters into an agreement or resolution to take any of the foregoing actions.

(3) Servicer, any employee or contractor of Servicer, or any employee or contractor of Servicers' contractors, or any Investor or borrower, commits a grossly negligent, willful or intentional, or reckless act (including, but not limited to, fraud) in connection with the Program or the Agreement.

(4) Any representation, warranty, or covenant made by Servicer in the Agreement or any Annual Certification is or becomes materially false, misleading, incorrect, or incomplete.

(5) An evaluation of performance that includes any specific findings by Freddie Mac, in its sole discretion, that Servicer's performance under any performance criteria established pursuant to the Program Documentation is materially insufficient, or any failure by Servicer to comply with any

- 5 -

directive issued by Fannie Mae or Freddie Mac with respect to documents or data requested, findings made, or remedies established, by Fannie Mae and/or Freddie Mac in conjunction with such performance criteria or other Program requirements.

B. Fannie Mae may take any, all, or none of the following actions upon an Event of Default by Servicer under the Agreement:

(1) Fannie Mae may: (i) withhold some or all of the Servicer's portion of the Purchase Price until, in Fannie Mae's determination, Servicer has cured the default; and (ii) choose to utilize alternative means of paying any portion of the Purchase Price for the credit or account of borrowers and Investors and delay paying such portion pending adoption of such alternative means.

(2) Fannie Mae may: (i) reduce the amounts payable to Servicer under Section 4.B; and/or (ii) require repayment of prior payments made to Servicer under Section 4.B, provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4.B. only with respect to loan modifications that are determined by Fannie Mae or Freddie Mac to have been impacted, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted, by the Event of Default giving rise to the remedy.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may terminate the Agreement and cease its performance hereunder as to some or all of the mortgage loans subject to the Agreement.

(5) Fannie Mae may require Servicer to submit to information and reporting with respect to its financial condition and ability to continue to meet its obligations under the Agreement.

C. Fannie Mae may take any, all, or none of the following actions upon an Event of Default involving an Investor or a borrower in connection with the Program:

(1) Fannie Mae may withhold all or any portion of the Purchase Price payable to, or for the credit or account of, the defaulting party until, in Fannie Mae's determination, the default has been cured or otherwise remedied to Fannie Mae's satisfaction.

(2) Fannie Mae may: (i) reduce the amounts payable to Servicer for the credit, or account of, the defaulting party under Section 4.B; and/or (ii) require repayment of prior payments made to the defaulting party under Section 4.B. Servicer will reasonably cooperate with, and provide reasonable support and assistance to, Fannie Mae and Freddie Mae in connection with their respective roles and, in Fannie Mae's case, in connection with its efforts to obtain repayment of prior payments made to Investors and borrowers as provided in this subsection.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may cease its performance hereunder as to some or all of the mortgage loans subject to the Agreement that relate to the defaulting Investor or borrower.

D. In addition to the termination rights set forth above, Fannie Mae may terminate the Agreement immediately upon written notice to Servicer:

- 6 -

(1) at the direction of the Treasury;

(2) in the event of a merger, acquisition, or other change of control of Servicer;

(3) in the event that a receiver, liquidator, trustee, or other custodian is appointed for the Servicer; or

(4) in the event that a material term of the Agreement is determined to be prohibited or unenforceable as referred to in Section 11.C.

E. The Agreement will terminate automatically:

(1) in the event that the Financial Agency Agreement, dated February 18, 2009, by and between Fannie Mae and the Treasury is terminated; or

(2) upon the expiration or termination of the Program.

F. The remedies available to Fannie Mae upon an Event of Default under this Section are cumulative and not exclusive; further, these remedies are in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

G. If the event of termination of the Agreement under any circumstances, Servicer and Fannie Mae agree to cooperate with one another on an ongoing basis to ensure an effective and orderly transition or resolution of the Services, including the provision of any information, reporting, records and data required by Fannie Mae and Freddie Mac.

H. If an Event of Default under Section 6.A.1., Section 6.A.4., or Section 6.A.5. occurs and Fannie Mae determines, in its sole discretion, that the Event of Default is curable and elects to exercise its right to terminate the Agreement, Fannie Mae will provide written notice of the Event of Default to Servicer and the Agreement will terminate automatically thirty (30) days after Servicer's receipt of such notice, if the Event of Default is not cured by Servicer to the reasonable satisfaction of Fannie Mae prior to the end of such thirty (30) day period. If Fannie Mae determines, in its sole discretion, that an Event of Default under Section 6.A.1. , Section 6.A.4, or Section 6.A. 5. is not curable, or if an Event of Default under Section 6.A.2. or Section 6.A.3. occurs, and Fannie Mae elects to exercise its right to terminate the Agreement under Section 6.B.4., Fannie Mae will provide written notice of termination to the Servicer on or before the effective date of the termination.


## 7. Disputes

Fannie Mae and Servicer agree that it is in their mutual interest to resolve disputes by agreement. If a dispute arises under the Agreement, the parties will use all reasonable efforts to promptly resolve the dispute by mutual agreement. If a dispute cannot be resolved informally by mutual agreement at the lowest possible level, the dispute shall be referred up the respective chain of command of each party in an attempt to resolve the matter. This will be done in an expeditious manner. Servicer shall continue diligent performance of the Services pending resolution of any dispute. Fannie Mae and Servicer reserve the right to pursue other legal or equitable rights they may have concerning any dispute. However, the parties agree to take all reasonable steps to resolve disputes internally before commencing legal proceedings.


## 8. Transfer or Assignment

A. Servicer must provide written notice to Fannie Mae and Freddie Mac pursuant to Section 9 below of: (i) any transfers or assignments of mortgage loans subject to this Agreement; and (ii) any other transfers or assignments of Servicer's rights and obligations under this Agreement. Such notice must include payment instructions for payments to be made to the transferee or assignee of the mortgage loans subject to the notice (if applicable), and evidence of the assumption by such transferee or assignee of the mortgage loans or other rights and obligations that are transferred, in the form of Exhibit C (the "Assignment and

- 7 -

Assumption Agreement"). Servicer acknowledges that Fannie Mae will continue to remit payments to Servicer in accordance with Section 4.B. with respect to mortgage loans that have been assigned or transferred, and that Servicer will be liable for underpayments, overpayments and misdirected payments, unless and until such notice and an executed Assignment and Assumption Agreement are provided to Fannie Mae and Freddie Mac. Any purported transfer or assignment of mortgage loans or other rights or obligations under the Agreement in violation of this Section is void.

B. Servicer shall notify Fannie Mae as soon as legally possible of any proposed merger, acquisition, or other change of control of Servicer, and of any financial and operational circumstances which may impair Servicer's ability to perform its obligations under the Agreement.

**9. Notices**

All legal notices under the Agreement shall be in writing and referred to each party's point of contact identified below at the address listed below, or to such other point of contact at such other address as may be designated in writing by such party. All such notices under the Agreement shall be considered received: (a) when personally delivered; (b) when delivered by commercial overnight courier with verification receipt; (c) when sent by confirmed facsimile; or (d) three (3) days after having been sent, postage prepaid, via certified mail, return receipt requested. Notices shall not be made or delivered in electronic form, except as provided in Section 12 B. below, provided, however, that the party giving the notice may send an e-mail to the party receiving the notice advising that party that a notice has been sent by means permitted under this Section.

To Servicer:

Wells Fargo Bank, N.A.
1 Home Campus
Des Moines, Iowa 50328-0001
Attention:

With a copy to:

Wells Fargo Bank, N.A.
1 Home Campus
Des Moines, Iowa 50328-0001
Attention : General Counsel,
Telephone:
Facsimile:
email:

- 8 -

To Fannie Mae:

> Fannie Mae
> 3900 Wisconsin Avenue, NW
> Washington, DC 20016
> Attention: General Counsel
> Facsimile:
> email:

To Treasury:

> Chief
> Office of Homeownership Preservation
> Office of Financial Stability
> Department of the Treasury
> 1500 Pennsylvania Avenue, NW
> Washington, DC 20220
> Facsimile: (202) 622-9219

To Freddie Mac:

> Freddie Mac
> 8100 Jones Branch Drive
> McLean, VA 22102
> Attention: Vice President, Making Home Affordable -- Compliance
> Facsimile: (703) 903-2544
> Email to: MHA_Compliance@freddiemac.com

## 10. Modifications

A. Subject to Sections 10.B. and 10.C., modifications to the Agreement shall be in writing and signed by Fannie Mae and Servicer.

B. Fannie Mae and the Treasury each reserve the right to unilaterally modify or supplement the terms and provisions of the Program Documentation that relate (as determined by Fannie Mae or the Treasury, in their reasonable discretion) to the compliance and performance requirements of the Program, and related remedies established by Freddie Mac, and/or to technical, administrative, or procedural matters or compliance and reporting requirements that may impact the administration of the Program.

C. Notwithstanding Sections 10.A. and 10.B., any modification to the Program Documentation that materially impact the borrower eligibility requirements, the amount of payments of the Purchase Price to be made to Participating Servicers, Investors and borrowers under the Program, or the rights, duties, or obligations of Participating Servicers, Investors or borrowers in connection with the Program (each, a "Program Modification" and, collectively, the "Program Modifications") shall be effective only on a prospective basis; Participating Servicers will be afforded the opportunity to opt-out of the Program when Program Modifications are published with respect to some or all of the mortgage loans sought to be modified under the Program on or after the effective date of the Program Modification, at Servicer's discretion. Opt-out procedures, including, but not limited to, the time and process for notification of election to opt-out and the window for such election, will be set forth in the Program Documentation describing the Program Modification, provided, however, that Servicer will be given at least thirty (30) days to elect to opt-out of a Program Modification. For the avoidance of doubt, during the period during which Servicer may elect to opt-out of a Program Modification

- 9 -

and after any such opt-out is elected by Servicer, Servicer will continue to perform the Services described in the Financial Instrument and the Program Documentation (as the Program Documentation existed immediately prior to the publication of the Program modification prompting the opt-out) with respect to qualifying mortgage loan modifications that were submitted by Servicer and accepted by Fannie Mae prior to the opt-out.

## 11. Miscellaneous

A. The Agreement shall be governed by and construed under Federal law and not the law of any state or locality, without reference to or application of the conflicts of law principles. Any and all disputes between the parties that cannot be settled by mutual agreement shall be resolved solely and exclusively in the United States Federal courts located within the District of Columbia. Both parties consent to the jurisdiction and venue of such courts and irrevocably waive any objections thereto.

B. The Agreement is not a Federal procurement contract and is therefore not subject to the provisions of the Federal Property and Administrative Services Act (41 U.S.C. §§ 251-260), the Federal Acquisition Regulations (48 CFR Chapter 1), or any other Federal procurement law.

C. Any provision of the Agreement that is determined to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of the Agreement, and no such prohibition or unenforceability in any jurisdiction shall invalidate such provision in any other jurisdiction.

D. Failure on the part of Fannie Mae to insist upon strict compliance with any of the terms hereof shall not be deemed a waiver, nor will any waiver hereunder at any time be deemed a waiver at any other time. No waiver will be valid unless in writing and signed by an authorized officer of Fannie Mae. No failure by Fannie Mae to exercise any right, remedy, or power hereunder will operate as a waiver thereof. The rights, remedies, and powers provided herein are cumulative and not exhaustive of any rights, remedies, and powers provided by law.

E. The Agreement shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest.

F. The Commitment and the Assignment and Assumption Agreement (if applicable) may be executed in two or more counterparts (and by different parties on separate counterparts), each of which shall be an original, but all of which together shall constitute one and the same instrument.

G. The Commitment, together with the Financial Instrument, the Annual Certifications, the Assignment and Assumption Agreement (if applicable) and the Program Documentation, constitutes the entire agreement of the parties with respect to the subject matter hereof. In the event of a conflict between any of the foregoing documents and the Program Documentation, the Program Documentation shall prevail. In the event of a conflict between the Program Guidelines and the Supplemental Directives, the Program Guidelines shall prevail.

H. Any provisions of the Agreement (including all documents incorporated by reference thereto) that contemplate their continuing effectiveness, including, but not limited to, Sections 4, 5 B., 6 F., 6 G., 9, 11 and 12 of the Commitment, and Sections 2, 3, 5, 7, 8, 9 and 10 of the Financial Instrument, and any other provisions (or portions thereof) in the Agreement that relate to, or may impact, the ability of Fannie Mae and Freddie Mac to fulfill their responsibilities as agents of the United States in connection with the Program, shall survive the expiration or termination of the Agreement.

## 12. Defined Terms; Incorporation by Reference

A. All references to the "Agreement" necessarily include, in all instances, the Commitment and all documents incorporated into the Commitment by reference, whether or not so noted contextually, and all amendments and modifications thereto. Specific references

throughout the Agreement to individual documents that are incorporated by reference into the Commitment are not inclusive of any other documents that are incorporated by reference, unless so noted contextually.

B.   The term "Effective Date" means the date on which Fannie Mae transmits a copy of the fully executed Commitment and Financial Instrument to Treasury and Servicer with a completed cover sheet, in the form attached hereto as Exhibit D (the "Cover Sheet"). The Commitment and Financial Instrument and accompanying Cover Sheet will be faxed, emailed, or made available through other electronic means to Treasury and Servicer in accordance with Section 9.

C.   The Program Documentation and Exhibit A – Form of Financial Instrument, Exhibit B – Form of Annual Certification, Exhibit C – Form of Assignment and Assumption Agreement and Exhibit D – Form of Cover Sheet (in each case, in form and, upon completion, in substance), including all amendments and modifications thereto, are incorporated into this Commitment by this reference and given the same force and effect as though fully set forth herein.

[SIGNATURE PAGE FOLLOWS; REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

In Witness Whereof, Servicer and Fannie Mae by their duly authorized officials hereby execute and deliver this Commitment to Purchase Financial Instrument and Servicer Participation Agreement as of the Effective Date.

SERVICER: Wells Fargo Home Mortgage, a division of Wells Fargo Bank, N.A.

By: _____

Name: Michael J. Heid

Title: Co-President

Date: 4-13-09

FANNIE MAE, solely as Financial Agent of the United States

By: _____

Name: Leslie Peeler

Title: Vice President

Date: 4-13-09

**EXHIBITS**

Exhibit A    Form of Financial Instrument

Exhibit B    Form of Annual Certification

Exhibit C    Form of Assignment and Assumption Agreement

Exhibit D    Form of Cover Sheet

## EXHIBIT A

## FORM OF FINANCIAL INSTRUMENT

## FINANCIAL INSTRUMENT

This Financial Instrument is delivered as provided in Section 1 of the Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), entered into as of the Effective Date, by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"). This Financial Instrument is effective as of the Effective Date. All of the capitalized terms that are used but not defined herein shall have the meanings ascribed to them in the Commitment.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Servicer agrees as follows:

1.  Purchase Price Consideration; Services. This Financial Instrument is being purchased by Fannie Mae pursuant to Section 4 of the Commitment in consideration for the payment by Fannie Mae, in its capacity as a financial agent of the United States, of various payments detailed in the Program Documentation and referred to collectively in the Commitment as the "Purchase Price." The conditions precedent to the payment by Fannie Mae of the Purchase Price are: (a) the execution and delivery of this Financial Instrument and the Commitment by Servicer to Fannie Mae; (b) the execution and delivery by Fannie Mae of the Commitment to Servicer; (c) the delivery of copies of the fully executed Commitment and Financial Instrument to Treasury on the Effective Date; (d) the performance by Servicer of the Services described in the Agreement; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement. Servicer shall perform all Services in consideration for the Purchase Price in accordance with the terms and conditions of the Agreement, to the reasonable satisfaction of Fannie Mae and Freddie Mac.

2.  Authority and Agreement to Participate in Program. Subject to the limitations set forth in Section 2 of the Agreement, Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority and to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any loan modification under the Program.

3.  Audits, Reporting and Data Retention.

    (a) Freddie Mac, the Federal Housing Finance Agency and other parties designated by the Treasury or applicable law shall have the right during normal business hours to conduct unannounced, informal onsite visits and to conduct formal onsite and offsite physical, personnel and information technology testing, security reviews, and audits of Servicer and to examine all books, records and data related to the Services provided and Purchase Price received in connection with the Program on thirty (30) days' prior written notice.

    (b) Servicer will collect, record, retain and provide to Treasury, Fannie Mae and Freddie Mac all data, information and documentation relating to the Program and borrowers, loans and loan modifications implemented, or potentially eligible for modification, under the Program and any trials conducted in connection with the Program, as required by the Program Documentation. All such data, information and documentation must be provided to the Treasury, Fannie Mae and Freddie Mac as, when and in the manner specified in the Program Documentation. In addition, Servicer shall provide copies of executed contracts and tapes of loan pools related to the Program for review upon request.

    (c) Servicer shall promptly take corrective and remedial actions associated with reporting and reviews as directed by Fannie Mae or Freddie Mac and provide to Fannie Mae and Freddie Mac such evidence of the effective implementation of corrective and remedial actions as Fannie Mae and Freddie Mac shall reasonably require. Freddie Mac may conduct additional reviews based on its findings and the corrective actions taken by Servicer.

(d) In addition to any other obligation to retain financial and accounting records that may be imposed by Federal or state law, Servicer shall retain all information described in Section 3(b), and all data, books, reports, documents, audit logs and records, including electronic records, related to the performance of Services in connection with the Program. In addition, Servicer shall maintain a copy of all computer systems and application software necessary to review and analyze these electronic records. Unless otherwise directed by Fannie Mae or Freddie Mac, Servicer shall retain these records for at least 7 years from the date the data or record was created, or for such longer period as may be required pursuant to applicable law. Fannie Mae or Freddie Mac may also notify Servicer from time to time of any additional record retention requirements resulting from litigation and regulatory investigations in which the Treasury or any agents of the United States may have an interest, and Servicer agrees to comply with these litigation and regulatory investigations requirements.

4.   Internal Control Program.

(a) Servicer shall develop, enforce and review on a quarterly basis for effectiveness an internal control program designed to: (i) ensure effective delivery of Services in connection with the Program and compliance with the Program Documentation; (ii) effectively monitor and detect loan modification fraud; and (iii) effectively monitor compliance with applicable consumer protection and fair lending laws. The internal control program must include documentation of the control objectives for Program activities, the associated control techniques, and mechanisms for testing and validating the controls.

(b) Servicer shall provide Freddie Mac with access to all internal control reviews and reports that relate to Services under the Program performed by Servicer and its independent auditing firm to enable Freddie Mac to fulfill its duties as a compliance agent of the United States; a copy of the reviews and reports will be provided to Fannie Mae for record keeping and other administrative purposes.

5.   Representations, Warranties and Covenants. Servicer makes the following representations, warranties and covenants to Fannie Mae, Freddie Mac and the Treasury, the truth and accuracy of which are continuing obligations of Servicer. In the event that any of the representations, warranties, or covenants made herein cease to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

(a) Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia, and has significant operations in the United States. Servicer has full corporate power and authority to enter into, execute, and deliver the Agreement and to perform its obligations hereunder and has all licenses necessary to carry on its business as now being conducted and as contemplated by the Agreement.

(b) Servicer is in compliance with, and covenants that all Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Program and the Agreement. The performance of Services under the Agreement will not conflict with, or be prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound,

- 2 -

provided, however, that Fannie Mae acknowledges and agrees that this representation and warranty is qualified solely by and to the extent of any contractual limitations established under applicable servicing contracts to which Servicer is subject. Servicer is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement and shall promptly notify Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Program or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debt or obligation that is being contested in good faith.

(c) Servicer covenants that: (i) it will perform its obligations in accordance with the Agreement and will promptly provide such performance reporting as Fannie Mae may reasonably require; (ii) all mortgage modifications and all trial period modifications will be offered to borrowers, fully documented and serviced in accordance with the Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that is relied upon by Fannie Mae or Freddie Mac in calculating the Purchase Price or in performing any compliance review will be true, complete and accurate in all material respects, and consistent with all relevant servicing records, as and when provided.

(d) Servicer covenants that it will: (i) perform the Services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) use qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation may require changes to, or the augmentation of, its systems, staffing and procedures, and covenants and agrees to take all actions necessary to ensure it has the capacity to implement the Program in accordance with the Agreement.

(e) Servicer covenants that it will comply with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflicts of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any).

(f) Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer covenants to disclose to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

(g) Servicer covenants to disclose to Fannie Mae and Freddie Mac any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Program.

(h) Servicer covenants that it will timely inform Fannie Mae and Freddie Mac of any anticipated Event of Default.

(i) Servicer acknowledges that Fannie Mae or Freddie Mac may be required to assist the Treasury with responses to the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a, inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and consumer advocacy group inquiries about the Program and its effectiveness. Servicer covenants that it will respond promptly and accurately to all search requests made by Fannie Mae or Freddie Mac, comply with any related procedures which Fannie Mae or Freddie Mac may establish, and provide related training to employees and contractors. In connection with Privacy Act inquiries, Servicer covenants that it will provide updated and corrected information as appropriate about borrowers' records to ensure that any system of record maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

(j) Servicer acknowledges that Fannie Mae is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Program, which may require additional support from Servicer. Servicer covenants that it will provide such additional customer service call support as Fannie Mae reasonably determines is necessary to support the Program.

(k) Servicer acknowledges that Fannie Mae and/or Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws. Servicer covenants that it will fully and promptly cooperate with Fannie Mae's inquiries about loan modification fraud and legal compliance and comply with any anti-fraud and legal compliance procedures which Fannie Mae and/or Freddie Mac may require. Servicer covenants that it will develop and implement an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of this Financial Instrument and acknowledges that the internal control program will be monitored, as provided in such Section.

(l) Servicer shall sign and deliver an Annual Certification to Fannie Mae and Freddie Mac beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term, in the form attached as Exhibit B to the Agreement.

6.  Use of Contractors. Servicer is responsible for the supervision and management of any contractor that assists in the performance of Services in connection with the Program. Servicer shall remove and replace any contractor that fails to perform. Servicer shall ensure that all of its contractors comply with the terms and provisions of the Agreement. Servicer shall be responsible for the acts or omissions of its contractors as if the acts or omissions were by the Servicer.

7.  Data Rights.

(a) For purposes of this Section, the following definitions apply:

(i) "Data" means any recorded information, regardless of form or the media on which it may be recorded, regarding any of the Services provided in connection with the Program.

(ii) "Limited Rights" means non-exclusive rights to, without limitation, use, copy, maintain, modify, enhance, disclose, reproduce, prepare derivative works, and distribute, in any manner, for any purpose related to the administration, activities, review, or audit of, or public reporting regarding, the Program and to permit others to do so in connection therewith.

- 4 -

(iii)   "NPI" means nonpublic personal information, as defined under the GLB.

(iv)   "GLB" means the Gramm-Leach-Bliley Act, 15 U.S.C. 6801-6809.

(b) Subject to Section 7(c) below, Treasury, Fannie Mae and Freddie Mac shall have Limited Rights, with respect to all Data produced, developed, or obtained by Servicer or a contractor of Servicer in connection with the Program, provided, however, that NPI will not be transferred by Fannie Mae in violation of the GLB and, provided, further, that Servicer acknowledges and agrees that any use of NPI by, the distribution of NPI to, or the transfer of NPI among, Federal, state and local government organizations and agencies does not constitute a violation of the GLB for purposes of the Agreement. If requested, such Data shall be made available to the Treasury, Fannie Mae, or Freddie Mac upon request, or as and when directed by the Program Documentation, in industry standard useable format.

(c) Servicer expressly consents to the publication of its name as a participant in the Program, and the use and publication of Servicer's Data, subject to applicable state and federal laws regarding confidentiality, in any form and on any media utilized by Treasury, Fannie Mae or Freddie Mac, including, but not limited to, on any website or webpage hosted by Treasury, Fannie Mae, or Freddie Mac, in connection with the Program, provided that no Data placed in the public domain will: (i) contain the name, social security number, or street address of any borrower or other information that would allow the borrower to be identified; or, (ii) if presented in a form that links the Servicer with the Data, include information other than program performance and participation related statistics such as the number of modifications, performance of modifications, characteristics of the modified loans, or program compensation or fees, with any information about any borrower limited to creditworthiness characteristics such as debt, income, and credit score. In any Data provided to an enforcement or supervisory agency with jurisdiction over the Servicer, these limitations on borrower information do not apply.

8.   Publicity and Disclosure.

(a) Servicer shall not make use of any Treasury name, symbol, emblem, program name, or product name, in any advertising, signage, promotional material, press release, Web page, publication, or media interview, without the prior written consent of the Treasury.

(b) Servicer shall not publish, or cause to have published, or make public use of Fannie Mae's name, logos, trademarks, or any information about its relationship with Fannie Mae without the prior written permission of Fannie Mae, which permission may be withdrawn at any time in Fannie Mae's sole discretion.

(c) Servicer shall not publish, or cause to have published, or make public use of Freddie Mac's name (i.e., "Freddie Mac" or "Federal Home Loan Mortgage Corporation"), logos, trademarks, or any information about its relationship with Freddie Mac without the prior written permission of Freddie Mac, which permission may be withdrawn at any time in Freddie Mac's sole discretion.

9.   Limitation of Liability. IN NO EVENT SHALL FANNIE MAE, THE TREASURY, OR FREDDIE MAC, OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR AFFILIATES BE LIABLE TO SERVICER WITH RESPECT TO THE PROGRAM OR THE AGREEMENT, OR FOR ANY

- 5 -

ACT OR OMISSION OCCURRING IN CONNECTION WITH THE FOREGOING, FOR ANY DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO DIRECT DAMAGES, INDIRECT DAMAGES, LOST PROFITS, LOSS OF BUSINESS, OR OTHER INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES OF ANY NATURE OR UNDER ANY LEGAL THEORY WHATSOEVER, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER OR NOT THE DAMAGES WERE REASONABLY FORESEEABLE; PROVIDED, HOWEVER, THAT THIS PROVISION SHALL NOT LIMIT FANNIE MAE'S OBLIGATION TO REMIT PURCHASE PRICE PAYMENTS TO SERVICER IN ITS CAPACITY AS FINANCIAL AGENT OF THE UNITED STATES IN ACCORDANCE WITH THE AGREEMENT.

10.     Indemnification. Servicer shall indemnify, hold harmless, and pay for the defense of Fannie Mae, the Treasury and Freddie Mac, and their respective officers, directors, employees, agents and affiliates against all claims, liabilities, costs, damages, judgments, suits, actions, losses and expenses, including reasonable attorneys' fees and costs of suit, arising out of or resulting from: (a) Servicer's breach of Section 5 (Representations, Warranties and Covenants) of this Financial Instrument; (b) Servicer's negligence, willful misconduct or failure to perform its obligations under the Agreement; or (c) any injuries to persons (including death) or damages to property caused by the negligent or willful acts or omissions of Servicer or its contractors. Servicer shall not settle any suit or claim regarding any of the foregoing without Fannie Mae's prior written consent if such settlement would be adverse to Fannie Mae's interest, or the interests of the Treasury or Freddie Mac. Servicer agrees to pay or reimburse all costs that may be incurred by Fannie Mae and Freddie Mac in enforcing this indemnity, including attorneys' fees.

IN WITNESS WHEREOF, Servicer hereby executes this Financial Instrument on the date set forth below.

Wells Fargo Home Mortgage, a division of Wells Fargo Bank, N.A.

_____          4-13-09
Michael J. Heid                            Date
Co-President
Wells Fargo Home Mortgage

- 6 -

## EXHIBIT B

### FORM OF ANNUAL CERTIFICATION

## ANNUAL CERTIFICATION

This Annual Certification is delivered as provided in Section 1.B. of the Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), effective as of [INSERT], by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"). All terms used, but not defined herein, shall have the meanings ascribed to them in the Commitment.

Servicer hereby certifies, as of [INSERT DATE ON WHICH CERTIFICATION IS GIVEN], that:

1.   Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia, and has significant operations in the United States. Servicer had full corporate power and authority to enter into, execute, and deliver the Agreement and to perform its obligations hereunder and has all licenses necessary to carry on its business as now being conducted and as contemplated by the Agreement.

2.   Servicer is in compliance with, and certifies that all Services have been performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made all governmental approvals or registrations required under law and has obtained all consents necessary to authorize the performance of its obligations under the Program and the Agreement. The performance of Services under the Agreement has not conflicted with, or been prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound, except to the extent of any contractual limitations under applicable servicing contracts to which Servicer is subject. Servicer is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement and has promptly notified Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Program or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debts or obligations that are being contested in good faith.

3.   (i) Servicer has performed its obligations in accordance with the Agreement and has promptly provided such performance reporting as Fannie Mae and Freddie Mac have reasonably required; (ii) all mortgage modifications and all trial period modifications have been offered by Servicer to borrowers, fully documented and serviced by Servicer in accordance with the Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that was relied upon by Fannie Mae and Freddie Mac in calculating the Purchase Price and in performing any compliance review, was true, complete and accurate in all material respects, and consistent with all relevant servicing records, as and when provided.

4.   Servicer has: (i) performed the Services required under the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) used qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation required changes to, or the augmentation of, its systems, staffing and procedures; Servicer took all actions necessary to ensure that it had the capacity to implement the Program in accordance with the Agreement.

5.   Servicer has complied with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflicts of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any).

6.   Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer has disclosed to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

7.      Servicer has disclosed to Fannie Mae and Freddie Mac any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Program.

8.      Servicer acknowledges that Fannie Mae and Freddie Mac may be required to assist the Treasury with responses to the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a, inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and consumer advocacy group inquiries about the Program and its effectiveness. Servicer has responded promptly and accurately to all search requests made by Fannie Mae and Freddie Mac, complied with any related procedures which Fannie Mae and Freddie Mac have established, and provided related training to employees and contractors. In connection with Privacy Act inquiries, Servicer has provided updated and corrected information as appropriate about borrowers' records to ensure that any system of record maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

9.      Servicer acknowledges that Fannie Mae is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Program, which may require additional support from Servicer. Servicer has provided such additional customer service call support as Fannie Mae has reasonably requested to support the Program.

10.     Servicer acknowledges that Fannie Mae and/or Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws. Servicer has fully and promptly cooperated with Fannie Mae's inquiries about loan modification fraud and legal compliance and has complied with any anti-fraud and legal compliance procedures which Fannie Mae and/or Freddie Mac have required. Servicer has developed and implemented an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of the Financial Instrument.

In the event that any of the certifications made herein are discovered not to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

[INSERT FULL LEGAL NAME OF SERVICER]:


_____          _____
[Name of Authorized Official]              Date
[Title of Authorized Official]

# EXHIBIT C

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment and Assumption Agreement") is entered into as of [INSERT DATE] by and between [INSERT FULL LEGAL NAME OF ASSIGNOR] ("Assignor") and [INSERT FULL LEGAL NAME OF ASSIGNEE] ("Assignee"). All terms used, but not defined, herein shall have the meanings ascribed to them in the Underlying Agreement (defined below).

WHEREAS, Assignor and Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae"), are parties to a Commitment to Purchase Financial Instrument and Servicer Participation Agreement, a complete copy of which (including all exhibits, amendments and modifications thereto) is attached hereto and incorporated herein by this reference (the "Underlying Agreement");

WHEREAS, Assignor has agreed to assign to Assignee: (i) all of its rights and obligations under the Underlying Agreement with respect to the mortgage loans identified on the schedule attached hereto as Schedule 1 ("Schedule 1") and/or (ii) certain other rights and obligations under the Underlying Agreement that are identified on Schedule 1; and

WHEREAS, Assignee has agreed to assume the mortgage loans and other rights and obligations under the Underlying Agreement identified on Schedule 1.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignment. Assignor hereby assigns to Assignee all of Assignor's rights and obligations under the Underlying Agreement with respect to the mortgage loans identified on Schedule 1 and such other rights and obligations under the Underlying Agreement that are identified on Schedule 1.

2. Assumption. Assignee hereby accepts the foregoing assignment and assumes all of the rights and obligations of Assignor under the Underlying Agreement with respect to the mortgage loans identified on Schedule 1 and such other rights and obligations under the Underlying Agreement that are identified on Schedule 1.

3. Effective Date. The date on which the assignment and assumption of rights and obligations under the Underlying Agreement is effective is [INSERT EFFECTIVE DATE OF ASSIGNMENT/ASSUMPTION].

4. Successors. All future transfers and assignments of the mortgage loans, rights and obligations transferred and assigned hereby are subject to the transfer and assignment provisions of the Underlying Agreement. This Assignment and Assumption Agreement shall inure to the benefit of, and be binding upon, the permitted successors and assigns of the parties hereto.

5. Counterparts. This Assignment and Assumption Agreement may be executed in counterparts, each of which shall be an original, but all of which together constitute one and the same instrument.

IN WITNESS WHEREOF, Assignor and Assignee, by their duly authorized officials, hereby execute and deliver this Assignment and Assumption Agreement, together with Schedule 1, effective as of the date set forth in Section 3 above.

**ASSIGNOR:** [INSERT FULL LEGAL NAME OF ASSIGNOR]         **ASSIGNEE:** [INSERT FULL LEGAL NAME OF ASSIGNEE]

By:_____          By:_____
Name:_____          Name:_____
Title:_____          Title:_____
Date:_____          Date:_____

- 2 -

# SCHEDULE 1

## To

### ASSIGNMENT AND ASSUMPTION AGREEMENT

## EXHIBIT D

## FORM OF COVER SHEET

EXHIBIT B

**U.S. DEPARTMENT OF THE TREASURY**
Washington
March 4, 2009

<u>**Making Home Affordable**</u>
**Summary of Guidelines**

Making Home Affordable *will offer assistance to as many as 7 to 9 million homeowners*, making their mortgages more affordable and helping to prevent the destructive impact of foreclosures on families, communities and the national economy.

*The Home Affordable Refinance* program will be available to 4 to 5 million homeowners who have a solid payment history on an existing mortgage owned by Fannie Mae or Freddie Mac. Normally, these borrowers would be unable to refinance because their homes have lost value, pushing their current loan-to-value ratios above 80%. Under the Home Affordable Refinance program, many of them will now be eligible to refinance their loan to take advantage of today's lower mortgage rates or to refinance an adjustable-rate mortgage into a more stable mortgage, such as a 30-year fixed rate loan.

GSE lenders and servicers already have much of the borrower's information on file, so documentation requirements are not likely to be burdensome. In addition, in some cases an appraisal will not be necessary. This flexibility will make the refinance quicker and less costly for both borrowers and lenders. The Home Affordable Refinance program ends in June 2010.

The *Home Affordable Modification* program will help up to 3 to 4 million at-risk homeowners avoid foreclosure by reducing monthly mortgage payments. Working with the banking and credit union regulators, the FHA, the VA, the USDA and the Federal Housing Finance Agency, the Treasury Department today announced program guidelines that are expected to become standard industry practice in pursuing affordable and sustainable mortgage modifications. This program will work in tandem with an expanded and improved Hope for Homeowners program.

With the information now available, **servicers can begin immediately to modify eligible mortgages** under the Modification program so that **at-risk borrowers can better afford their payments.** The detailed guidelines (separate document) provide information on the following:

<u>Eligibility and Verification</u>
- Loans originated on or before January 1, 2009.
- First-lien loans on owner-occupied properties with unpaid principal balance up to $729,750. Higher limits allowed for owner-occupied properties with 2-4 units.
- All borrowers must fully document income, including signed IRS 4506-T, two most recent pay stubs, and most recent tax return, and must sign an affidavit of financial hardship.
- Property owner occupancy status will be verified through borrower credit report and other documentation; no investor-owned, vacant, or condemned properties.
- Incentives to lenders and servicers to modify at risk borrowers who have not yet missed payments when the servicer determines that the borrower is at imminent risk of default.
- Modifications can start from now until December 31, 2012; loans can be modified only once under the program.

<u>Loan Modification Terms and Procedures</u>
- Participating servicers are required to service all eligible loans under the rules of the program unless explicitly prohibited by contract; servicers are required to use reasonable efforts to obtain waivers of limits on participation.
- Participating loan servicers will be required to use a net present value (NPV) test on each loan that is at risk of imminent default or at least 60 days delinquent. The NPV test will compare the net present value of cash flows with modification and without modification. If the test is positive

– meaning that the net present value of expected cash flow is greater in the modification scenario – the servicer must modify absent fraud or a contract prohibition.

- Parameters of the NPV test are spelled out in the guidelines, including acceptable discount rates, property valuation methodologies, home price appreciation assumptions, foreclosure costs and timelines, and borrower cure and redefault rate assumptions.
- Servicers will follow a specified sequence of steps in order to reduce the monthly payment to no more than 31% of gross monthly income (DTI).
- The modification sequence requires first reducing the interest rate (subject to a rate floor of 2%), then if necessary extending the term or amortization of the loan up to a maximum of 40 years, and then if necessary forbearing principal. Principal forgiveness or a Hope for Homeowners refinancing are acceptable alternatives.
- The monthly payment includes principal, interest, taxes, insurance, flood insurance, homeowner's association and/or condominium fees. Monthly income includes wages, salary, overtime, fees, commissions, tips, social security, pensions, and all other income.
- Servicers must enter into the program agreements with Treasury's financial agent on or before December 31, 2009.

Payments to Servicers, Lenders, and Responsible Borrowers
- The program will share with the lender/investor the cost of reductions in monthly payments from 38% DTI to 31% DTI.
- Servicers that modify loans according to the guidelines will receive an up-front fee of $1,000 for each modification, plus "pay for success" fees on still-performing loans of $1,000 per year.
- Homeowners who make their payments on time are eligible for up to $1,000 of principal reduction payments each year for up to five years.
- The program will provide one-time bonus incentive payments of $1,500 to lender/investors and $500 to servicers for modifications made while a borrower is still current on mortgage payments.
- The program will include incentives for extinguishing second liens on loans modified under this program.
- No payments will be made under the program to the lender/investor, servicer, or borrower unless and until the servicer has first entered into the program agreements with Treasury's financial agent.
- Similar incentives will be paid for Hope for Homeowner refinances.

Transparency and Accountability
- Measures to prevent and detect fraud, such as documentation and audit requirements, will be central to the program.
- Servicers will be required to collect, maintain and transmit records for verification and compliance review, including borrower eligibility, underwriting, incentive payments, property verification, and other documentation.
- Freddie Mac will audit compliance.

###