UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILLIP R. CORVELLO,<br><br>   Plaintiff,<br><br>  v.<br><br>WELLS FARGO BANK N.A,<br><br>   Defendant. | Case No. 10-cv-05072-VC<br><br>**ORDER GRANTING IN PART, AND DENYING IN PART, JOINT MOTION FOR CLASS CERTIFICATION**<br><br>Re: Dkt. No. 75 |
| AMIRA JACKMON,<br><br>   Plaintiff,<br><br>  v.<br><br>AMERICA'S SERVICING COMPANY, et al.,<br><br>   Defendants. | Case No. 11-cv-03884-VC<br><br><br>Re: Dkt. No. 129 |

I

  This case is about Wells Fargo's participation in the Home Affordable Modification Program ("HAMP"), which is administered by the Treasury Department. In the wake of the recent financial crisis, the Department began working with banks to implement HAMP in an effort to help prevent people from losing their homes. Through HAMP, borrowers who meet certain criteria can have their home loans modified to make their payments more affordable. In exchange for participating in this program, banks like Wells Fargo receive incentives, including bonuses for each borrower who receives a permanent loan modification.

As the initial step toward receiving permanent loan modifications, borrowers enter into "Trial Period Plans" ("TPPs") with their lenders. Servicers like Wells Fargo use a document — a uniform instrument distributed by the federal government — that describes what is supposed to happen during the trial period. A copy of the version of the TPP document Wells Fargo used during the period applicable to this case (prior to March 1, 2010) is attached as Appendix A to this decision.

By signing this TPP document, the Wells Fargo borrower certified that she was unable to make her mortgage payments, that she lived at the property subject to the mortgage, and that she already had (or that she would) give the lender documentation of her income. App. A, § 1. The borrower also agreed to make three modified loan payments on a trial basis. *Id.* § 2. If the borrower made the three trial payments on time, and provided the accurate financial information required under the TPP (and if that information showed that she was qualified), she was entitled to a permanent loan modification. Specifically, the TPP document provided:

> If I comply with the requirements in Section 2, and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date.

*Id.* § 3.

The trial period established by the TPP document was typically about three months. The TPP document described the trial period as "commencing on the Trial Period Effective Date and ending on the earlier of: (i) the first day of the month following the month in which the last Trial Period Payment is due (the 'Modification Effective Date') or (ii) termination of this plan." *Id.* § 2. The TPP document seemed to contemplate that the lender would determine the borrower's eligibility during that three-month period. For example:

> If prior to the Modification Effective Date . . . the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate.

*Id.* § 2F.

2

And there was language earlier in the TPP document which could theoretically be read to suggest that, if for some reason a borrower did not qualify for a permanent modification, Wells Fargo was required to notify that borrower in writing before the end of the three-month period:

> If I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all of my income . . . to determine whether I qualify for the offer described in this Plan ("the Offer"). I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer.

*Id.* Preamble.

In light of the TPP document's terms, it is at least conceivable that, for every borrower who participated in a TPP, Wells Fargo was obligated to do one of two things: (1) give the borrower a permanent modification after the three-month period if she satisfied the requirements the TPP imposed on her; or (2) inform the borrower of a denial before the end of the three-month period, if the borrower did not qualify for a permanent modification (because she failed to make her trial payments, or failed to timely provide the bank with accurate documentation of her financial condition, or provided documentation which showed that she didn't qualify financially for a modification).

## II

There are four related cases before this Court in which the plaintiffs seek to impose liability on Wells Fargo for its participation in HAMP. These cases are: *Lucia v. Wells Fargo Bank, N.A.*, No. 3:10-cv-04749; *Corvello v. Wells Fargo Bank N.A.*, No. 3:10-cv-05072; *Jackmon v. America's Servicing Co.*, No. 3:11-cv-03884; and *Goodman v. Wells Fargo Bank, N.A.*, No. 3:15-cv-02856. The plaintiffs in these cases are borrowers who entered into TPPs with Wells Fargo and made the three payments required by the TPP document, but who neither received permanent loan modifications at the end of the trial period nor received notification from Wells Fargo during the trial period that they didn't qualify for a permanent modification. Although the cases differ slightly, in each case the plaintiffs assert that Wells Fargo misled

3

borrowers, and failed to fulfill its promises to them, in administering the program. For example, in all four cases the plaintiffs allege that the TPP document was a contract, and that Wells Fargo breached its obligations to them as set forth in that contract. In some of the cases, the plaintiffs allege that Wells Fargo's use of the TPP document constituted an unlawful debt collection practice, in violation of California's Rosenthal Fair Debt Collection Practices Act. The specific legal theories that are the subject of this class certification motion are discussed more fully in Section III.

All four cases were previously assigned to different judges. The district judge who was assigned to *Lucia* and *Corvello* dismissed those lawsuits at the pleading stage. The district judge ruled there was no binding contract between Wells Fargo and the borrowers who participated in TPPs, and that the plaintiffs also failed to state a claim under the Rosenthal Act. *Lucia v. Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 1059, 1068, 1071–72 (N.D. Cal. 2011), *rev'd sub nom. Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878 (9th Cir. 2013). The Ninth Circuit reversed the dismissal, holding that the TPP document was a binding contract. *Corvello*, 728 F.3d at 883–84. The Ninth Circuit also revived the Rosenthal Act claim, concluding that Wells Fargo's administration of the TPP plausibly constituted debt collection activity that was covered by the statute. *Id.* at 885.

In *Jackmon*, a different district judge denied motions by Wells Fargo to deny class certification and to dismiss claims for rescission and restitution. No. 3:11-cv-03884, Dkt. No. 92. The *Goodman* case was initially filed in the Los Angeles Superior Court, and was removed to the Central District of California by Wells Fargo. The district judge twice remanded the case to state court, and the Ninth Circuit twice reversed the remand orders. *Goodman v. Wells Fargo Bank, N.A.*, 602 F. App'x 681, 681 (9th Cir. 2015) (unpublished). The district judge then granted a joint motion to transfer the case to the Northern District. No. 3:15-cv-02856, Dkt. No. 49.

Now the four cases have been related to one another, and they have been transferred to the undersigned district judge. The plaintiffs in *Corvello* and *Jackmon* have now filed a joint motion for class certification. Corvello and Jackmon seek to represent a national class to pursue

their claims for breach of contract. And they seek to represent a California class to pursue claims for deceptive debt collection practices under the Rosenthal Act, as well as claims for rescission, restitution, and violations of the Unfair Competition Law. In both the national and California classes, the proposed class members are:

> residential mortgage borrowers who (a) entered into Homeowner Affordable Modification Program (HAMP) Trial Period Plans (TPPs) with Wells Fargo Bank N.A. (Wells Fargo) effective on or before March 1, 2010, and (b) made the scheduled trial payments, but (c) did not obtain permanent HAMP loan modifications.

Pls' Mot. for Class Certification, at i.

To support their motion for class certification, the plaintiffs offer considerable evidence about how Wells Fargo handled TPPs during the applicable time period.[1] Their evidence suggests Wells Fargo knew the TPPs would cause participating borrowers to expect permanent modifications if they complied with requirements set forth in the TPP document. For example, former Wells Fargo executive Ben Windust stated in a deposition that "engaging the borrower in the program and starting out a trial would start to set some expectations [that] they're working down the path of getting a modification," and that the TPP document itself contributed to those expectations. Pls' Mot. for Class Certification, Ex. E, Windust Dep., 37:14–38:20.

The evidence suggests that at the same time, Wells Fargo believed it wasn't obligated to meet those expectations, and actually knew it was not capable of meeting those expectations. For example, Wells Fargo abandoned its initial practice of qualifying borrowers (that is, verifying their incomes) before enrolling them in TPPs, in favor of practices that allowed it to more quickly increase the volume of participants (that is, by relying on estimates of income, such as borrowers' statements about their income). Pls' Mot. for Class Certification, Ex. D, No. 6469; *id.*, No. 2699. As a result, many borrowers who never could have qualified for HAMP modifications were entered into TPPs. Wells Fargo actively recruited more and more borrowers into TPPs, even though it did not have the capacity to process all their applications in a timely

---

[1] Both parties' unopposed requests for judicial notice are granted.

fashion, or deliver on all the loan modification promises it was making.  *E.g.*, Pls' Mot. for Class Certification, Ex. D, No. 564 ("[I]f we are successful in getting 100k or more trial mods and build a great 'sales' engine, we won't have the capacity to underwrite and fulfill the loans."); *id.*, No. 6722 (Ben Windust noting, in a July 30, 2009 email, that "our top end HAMP trial volume will be approximately 10,000 per month" which would get Wells Fargo only "about half way to our target goal of 100,000 loans by October 31").  Wells Fargo also operated as though the TPP did not impose a requirement that the lender act within a certain timeframe.  *E.g.*, Pls' Mot. for Class Certification, Ex. F, Crabtree Dep., 237:22–238:3 (stating that "if . . . all the stars and the moon aligned and all the documents came in right then," Wells Fargo would review TPP participant's eligibility before all three trial payments were made); *id.*, Ex. E, Windust Dep., 66:11 (describing Modification Effective Date as "estimated").  Indeed, until the Ninth Circuit ruled otherwise, Wells Fargo has consistently argued that the TPP document was not a contract at all.  The evidence the plaintiffs have adduced supports their claim that despite enrolling thousands of borrowers in a program that led them to expect permanent modifications within a certain timeframe, Wells Fargo didn't intend to meet, never thought it was obligated to meet, and knew it likely couldn't meet, those borrowers' expectations.

## III

The party seeking class certification must demonstrate by a preponderance of the evidence that the requirements of Rule 23 are met.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  Before certifying a class, the Court must be satisfied that the plaintiff has met the basic requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy.  The Court must also be satisfied that the party seeking certification has met the requirements of one of the three subsections of Rule 23(b).  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  In this motion to certify classes under Rule 23(b)(3), that means the plaintiffs must establish that class questions predominate over individual questions, and that class treatment is superior to other forms of adjudication.  Here, with respect to all the claims for which Corvello and Jackmon seek class certification, the only meaningful disputes concern whether the plaintiffs

have identified common questions, and if so, whether those common questions predominate.

## A

The plaintiffs contend that Wells Fargo violated California's Rosenthal Act, and did so with respect to each class member, because the TPP document was misleading. The Rosenthal Act creates a state-law claim against those who engage in debt collection activities in violation of the federal Fair Debt Collection Practices Act ("FDCPA") — including the use of deceptive means to collect a debt. Claims under the Rosenthal Act (and the FDCPA) are analyzed from the perspective of the "least sophisticated debtor," an objective standard. *See Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 934 (9th Cir. 2007). There is no need to prove that an individual debtor was deceived by a communication from a debt collector; only that the least sophisticated debtor would have been deceived. *Gonzales v. Arrow Fin. Servs. LLC*, 489 F. Supp. 2d 1140, 1153 (S.D. Cal. 2007), *aff'd by* 660 F.3d 1055 (9th Cir. 2011).

There are two, somewhat related, common questions driving each potential class member's Rosenthal Act claim. The first is whether the TPP document's language would lead the least sophisticated borrower into thinking she would receive a permanent loan modification once she had complied with its terms for three months. If so, the plaintiffs have a fairly strong case that the TPP document was misleading within the meaning of the Rosenthal Act, because there is evidence suggesting Wells Fargo believed it was not obligated to live up to that promise of a permanent loan modification within that time frame, that it did not intend to do so, and that it knew it lacked the administrative capacity to process TPPs within that time frame. The answer to that question will be the same for every borrower, and it will be answered with reference to the language of the TPP document (along with, perhaps, evidence of Wells Fargo's practices and intentions in administering the TPP program). If Wells Fargo's communications to the borrowers in the TPP document were misleading to the least sophisticated debtor, it will be liable under the Rosenthal Act to everyone in the class; if the communications were not misleading to the least sophisticated debtor, it will be liable to nobody under that statute.

The second common Rosenthal Act question overlaps somewhat with the question

discussed above, and it also overlaps somewhat with the plaintiffs' breach of contract theory. The plaintiffs contend that Wells Fargo, in the TPP document, promised it would do one of two things for every borrower: either (1) give the borrower a permanent loan modification after three months if the borrower met her obligations under the TPP; or (2) notify the borrower *before* the end of the three-month period if she did not qualify for a permanent loan modification. If the plaintiffs are correct that the TPP document would lead the least sophisticated debtor to believe that Wells Fargo would do one of those two things, then Wells Fargo violated the Rosenthal Act with respect to every class member (because the proposed class consists of people who made their three trial payments but received neither a timely permanent modification nor a timely notification that they wouldn't get one). If the plaintiffs are wrong that the TPP document would mislead the least sophisticated debtor into believing Wells Fargo would do one of these two things, then Wells Fargo did not violate the Rosenthal Act with respect to any class member.

These are not merely common questions that will yield common answers; they also predominate. Wells Fargo argues that individual questions will predominate — questions about any separate communications it may have had with individual borrowers regarding the terms of their TPPs. But that's not true for the Rosenthal Act claim, because resolution of that claim doesn't depend on the subjective understanding of each borrower who received the TPP document and made trial payments, and so it doesn't matter whether Wells Fargo had separate subsequent communications with borrowers on the topic. What matters, in short, is whether the TPP document itself was misleading.

Wells Fargo also argues that the TPP document cannot form the basis of a Rosenthal Act claim because its use was mandated by the government as a condition of the bank's participation in HAMP. If anything, that argument further supports class treatment for the Rosenthal Act claim — if Wells Fargo is correct, the bank will win against everyone. If Wells Fargo is wrong, it will be wrong as to everyone. The common questions therefore predominate. *See Gaudin v.*

8

*Saxon Mortgage Servs., Inc.*, 297 F.R.D. 417, 429 (N.D. Cal. 2013).[2] And to the extent the plaintiffs' UCL claims are premised on violations of the Rosenthal Act, the same common questions exist, and those common questions predominate, for the reasons discussed above. *See Gaudin*, 297 F.R.D. at 430–31 ("Plaintiff's unlawful practices claim [is based] on her Rosenthal Act claim, and proving it will require the same proof.").

Finally, with respect to the Rosenthal Act claim, Wells Fargo argues that class treatment is not the superior form of adjudication. It contends that given the FDCPA's $500,000 limit on statutory damages in class actions, class members would be better off if they pursued their Rosenthal Act claims individually, where they could obtain up to $1,000 in statutory damages per person. *See* 15 U.S.C. § 1692k(a)(2)(A); Cal. Civ. Code § 1788.30(b). But as an initial matter, statutory damages are not the sole source of damages available to the class members — they may be able to recover actual damages as well, 15 U.S.C. § 1692k(a)(1), or restitution under the UCL. Moreover, even with respect to statutory damages, Wells Fargo appears to assume that every borrower who pursued an individual Rosenthal Act claim would be able to recover the maximum amount of statutory damages (namely, $1,000). But the maximum statutory damages award of $1,000 is not automatic. 15 U.S.C. § 1692k(a)(2)(A) (setting liability for "such additional damages as the court may allow"). Instead, the amount of statutory damages (if any) depends on a court's analysis of many factors. *See* 15 U.S.C. § 1692k(b)(1). Individual class members would not be sacrificing an automatic higher award of statutory damages, but the opportunity to argue for one on a case-by-case basis.

And that would be difficult to do, because the proposed class consists largely of financially distressed people — people who have been having trouble making their mortgage payments. It is likely that the large majority of these people would be unable to pursue a claim

---

[2] At first glance, it seems wrong to say that Wells Fargo is immunized from a Rosenthal Act claim by the fact that the government required it to use the TPP document. The reason the document was misleading, under the plaintiffs' theory, is that Wells Fargo knew it was not likely to fulfill the promises it was making in the document. Therefore, under the plaintiffs' theory, it was not the government that forced Wells Fargo to mislead borrowers.

9

of any sort if required to proceed on their own.  This itself is a factor weighing in favor of class treatment.  *Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2011).

The motion to certify a California class to pursue the Rosenthal Act claim, and the UCL claim that is grounded in violations of the Rosenthal Act, is granted.

## B

As mentioned, the plaintiffs also contend that the TPP document was a contract, and that Wells Fargo breached the contract.  Specifically, the plaintiffs contend that for each member of the proposed class, Wells Fargo breached the contract in one of two ways.  For one type of class member (the borrower who made her trial payments, qualified financially, and submitted all the right documents), Wells Fargo breached by not providing a permanent modification at the end of the trial period.  For the other type of class member (the borrower who made her trial payments but did not qualify financially or did not submit the right documents), Wells Fargo breached by not sending a rejection letter before the end of the trial period.

The problem with this formulation is that the plaintiffs, in an attempt to identify a common question, have posed the question at an exceedingly high level of generality: Did Wells Fargo breach the contract somehow?  As a result, the answer does not help resolve the litigation.  To the extent this can be considered a common question at all (and as discussed below, it probably can't), too many individual questions remain, and those questions would predominate.

Take, for example, the class members who contend they fulfilled their part of the bargain as set out in the TPP document and therefore were entitled to a permanent modification at the end of the trial period.  Wells Fargo, of course, has the right to dispute that any particular borrower did, in fact, qualify.  *See Dukes*, 131 S. Ct. at 2541.  And as the Ninth Circuit recognized in *Corvello*, factual disputes will exist about whether a borrower actually qualified. 728 F.3d at 885.  Individual inquiries, such as whether a particular borrower gave the bank sufficient income documentation, or whether that documentation was accurate, would predominate.  On this point, the Court agrees with *In re Bank of America Home Affordable*

*Modification Program Contract Litigation*, 2013 WL 4759649, at *10–11, and disagrees with the class certification result reached on the breach of contract claim in *Gaudin*.

Now consider the proposed class members who could not have qualified for a permanent modification, but who contend that Wells Fargo breached the TPP document by failing to notify them of their failure to qualify before the end of the trial period. This poses individual questions that would be even more difficult to adjudicate. During the three-month period of each TPP there could have been any number of subsequent communications between the borrower and the lender that might have altered the parties' contractual obligations. It's not hard to imagine, for example, Wells Fargo calling a borrower to find out when she would be submitting income verification documents, and the borrower asking for more time to obtain the paperwork. (This happens with great regularity in individual mortgage fraud cases in the Northern District of California that are referred to the Court's ADR program to explore the possibility of a loan modification, even when the borrowers in those cases have a lawyer and a mediator to guide them in gathering that documentation.) It is also easy to imagine the bank asking the borrower for more time to process and analyze her paperwork, and the borrower agreeing. (This too happens regularly in mortgage fraud mediations.) In such scenarios, even assuming the plaintiffs' preferred interpretation of the TPP document is correct (that is, that Wells Fargo had to give the borrower a written notification that she was not eligible before the end of the trial period), a court would have to investigate whether the parties had altered their respective obligations before deciding whether Wells Fargo committed a breach of contract. *See In re Citimortgage, Inc. Home Affordable Modification Program ("HAMP") Litig.*, 2013 WL 8844095, at *6 (C.D. Cal. Oct. 7, 2013), *appeal filed*, No. 13-57158 ("[T]he deadline by which [the lender] was required to provide either a permanent modification or a written denial cannot be made simply by identifying the [Modification Effective Date] as stated in the TPP. The deadline may also have been affected by the parties' course of conduct."). Indeed, given the individual inquiries that would be required to determine whether Wells Fargo breached the TPP document, the breach-of-contract question the plaintiffs have posed is probably not even a

"common" one (much less a predominant one), because different answers would be required for different plaintiffs.

What's more, in adjudicating the plaintiffs' breach of contract theory, it's unclear how a court or jury could possibly decide how to categorize each class member (that is, how to decide whether a borrower should have received a modification or a timely notice of denial) on anything other than an individual basis. This problem is underscored upon review of the plaintiffs' proposed approach to damages. The plaintiffs suggest that for class members "who obtained inferior loan modifications after being denied HAMP loan modifications," their contract damages should be the value of the difference "between the HAMP loan modification they were contractually promised and the loan modifications they actually obtained." Pls' Joint Trial Plan, at 2. This approach assumes that every class member who later received an "inferior" modification was entitled to a HAMP loan modification, and fails to recognize that some of those people might not have been entitled to a HAMP modification in the first place. And it leaves to the imagination how someone who never qualified for a HAMP modification in the first place might be compensated if she received an "inferior" loan modification after Wells Fargo failed to timely inform her that she didn't qualify for the HAMP modification.[3]

Because these individual questions will predominate over any questions that might potentially be common to the class, the motion to certify a national class to pursue the breach of contract claim is denied.

## C

---

[3] Incidentally, for purposes of this motion the Court has assumed the validity of the plaintiffs' theory that the TPP document required Wells Fargo to notify TPP participants of a failure to qualify before the end of the trial period. The primary sentence from the TPP document on which the plaintiffs rely in support of this theory says: "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer." It seems like the more natural reading of this sentence is that Wells Fargo was promising borrowers it would notify them if they didn't qualify to participate in a TPP at the outset, not that it was promising borrowers it would notify them before the end of the trial period if they didn't qualify for a permanent modification. But the meaning ascribed by the plaintiffs to this sentence is at least plausible, as evidenced by the fact that the Ninth Circuit seemed to assume the same meaning, albeit in passing. *Corvello*, 728 F.3d at 881.

The plaintiffs assert California state-law claims for rescission of the TPP transaction and restitution of their trial payments. They barely provide any discussion in support of their motion to certify a California class for these claims, simply contending they are based on the same breach-of-contract theory described above:

> As in *Gaudin*, "[p]roving this will involve substantially the same issues [as the contract claim], and the common issues predominate over individualized inquiries." . . .
>
> As with the contract claim, the rescission claim turns on interpretation of the TPP in the context of Wells Fargo's uniform course of conduct with respect to its HAMP implementation.

Pls' Mot. for Class Certification, at 18 (quoting *Gaudin*, 197 F.R.D. at 439). Therefore, the motion to certify a California class to pursue claims for rescission and restitution is also denied.

## IV

In light of the foregoing, the joint motion for class certification is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated: January 29, 2016

_____
VINCE CHHABRIA
United States District Judge