BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
THOMAS J. O'REARDON II (247952)
701 B Street, Suite 1700
San Diego, CA  92101
Telephone: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
lhurst@bholaw.com
toreardon@bholaw.com

LAW OFFICE OF PETER FREDMAN PC
PETER B. FREDMAN (189097)
125 University Ave., Suite 102
Berkeley, CA  94710
Telephone: 510/868-2626
510/868-2627 (fax)
peter@peterfredmanlaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
STEVE W. BERMAN (*pro hac vice*)
THOMAS E. LOESER (202724)
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone: 206/623-7292
206/623-0594 (fax)
toml@hbsslaw.com

Attorneys for Plaintiff and the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PHILLIP R. CORVELLO, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK N.A. d/b/a WELLS FARGO HOME MORTGAGE d/b/a AMERICA'S SERVICING COMPANY,<br><br>Defendant. | No.:          4:10-CV-05072-VC<br><br><u>CLASS ACTION</u><br><br>FIRST AMENDED CLASS ACTION COMPLAINT<br><br>Judge:      Honorable Vince Chhabria<br>Courtroom:   4, 17th Floor<br><br><u>DEMAND FOR JURY TRIAL</u> |

BLOOD HURST & O'REARDON, LLP

00100370

1    Plaintiff Phillip R. Corvello ("plaintiff"), brings this action on behalf of himself and all
2    others similarly situated against defendant Wells Fargo Bank N.A. d/b/a Wells Fargo Home
3    Mortgage d/b/a America's Servicing Company ("Wells Fargo" or "defendant"), and states:

**NATURE OF THE ACTION**

5    1.    Defendant systematically fails to honor its promises and obligations relating to
6    mortgage modifications.  Pursuant to federal programs and direct contractual agreements with
7    ordinary consumers, mortgage servicers, including defendant, are obligated to reduce monthly
8    mortgage payments to affordable levels or move borrowers to more stable products.  Based on
9    their promises to help borrowers stay current on their mortgages, mortgage servicers, like
10   defendant, have received ***billions*** of dollars from borrowers and government programs.   In
11   fact, in October 2008, Wells Fargo accepted $25 billion in Troubled Asset Relief Program
12   ("TARP") funds.  12 U.S.C. §5211.

13   2.    On March 4, 2009, the Making Home Affordable Plan was signed into federal
14   law as part of the Emergency Economic Stabilization Act of 2008.   The Making Home
15   Affordable Plan has two components: (a) the Home Affordable Refinance Program, and (b) the
16   Home Affordable Modification Program ("HAMP").   As for HAMP, its stated purpose is to
17   provide eligible homeowners the opportunity to modify their mortgages to make them more
18   affordable.  In furtherance of HAMP's goals, the Treasury Department, through Fannie Mae,
19   entered into agreements ("Servicer Participation Agreements") with mortgage servicers.

20   3.    On April 13, 2009, Wells Fargo, signed a Servicer Participation Agreement for
21   HAMP (attached hereto as Exhibit A) (the "Wells Fargo Servicer Participation Agreement").
22   By signing the Servicer Participation Agreement, Wells Fargo agreed to perform specified
23   loan modification and other foreclosure prevention services.

24   4.    Wells Fargo's Servicer Participation Agreement requires Wells Fargo to modify
25   loans, and identifies objective criteria to determine which loans are eligible for modification
26   and how the loans should be modified.  The unambiguous purpose of the Servicer Participation
27   Agreement is to provide loan modification services to eligible borrowers.  Plaintiff and Class

28

BLOOD HURST & O'REARDON, LLP

FIRST AMENDED CLASS ACTION COMPLAINT                    1

00100370

members (defined below) are the intended third-party beneficiaries of Wells Fargo's Servicer Participation Agreement under HAMP.

5.    The Servicer Participation Agreement ("SPA") incorporates all previous guidelines, procedures, instructions and communications, including all "Supplemental Directives" issued by the United States Treasury Department, Fannie Mae and Freddie Mac in connection with the duties of a participating servicer, Wells Fargo.  In September 2010, these documents, including the Supplemental Directives, were compiled and incorporated into one set of HAMP guidelines entitled, "Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages, Version 2.0 As of September 22, 2010" (the "Handbook").

6.    After accepting billions of dollars in federal relief funds under HAMP, Wells Fargo has not followed through with its responsibilities, contractual obligations, and promises to modify home mortgages of consumers at risk of foreclosure.  Instead, it ignores eligible participants altogether, or extends promises to modify mortgages, accepts trial payments, but then fails to permanently modify mortgages.

7.    Under the HAMP guidelines, Wells Fargo is obligated to identify and contact borrowers eligible for loan modifications based upon their delinquency status.  Borrowers at imminent risk of default may also contact Wells Fargo to initiate the modification process.

8.    At the onset of the modification process, Wells Fargo requests and gathers specific income documentation and confirms the eligibility of the borrower applicants consistent with the HAMP guidelines.  After Wells Fargo collects this information, it screens the applicants through the HAMP underwriting process to determine:  (a) the feasibility of the modification (referred to as the HAMP "waterfall" procedure) and; (b) whether the value of the modified loan exceeds the expected value of the loan were it not modified (the "Net Present Value" test).

9.    After Wells Fargo determines if the borrower is eligible for the modification and confirms the feasibility of the new terms, Wells Fargo provides the borrower a "Trial Period Plan" ("TPP") contract offer.  Under the terms of the TPP offer, if the borrower satisfies two conditions precedent by: (a) making three "modified" trial payments (over the

BLOOD HURST & O'REARDON, LLP

FIRST AMENDED CLASS ACTION COMPLAINT                    2

course of three months); and (b) remaining eligible with respect to the other HAMP criteria (maintaining employment, income level and financial hardship), then Wells Fargo "will" provide the borrower with a permanent loan modification.

10.     HAMP guidelines require Wells Fargo to fully perform the underwriting process, including determining the feasibility and calculating the net present value test for the modification *before* accepting the borrower applicant's initial Trial Period Plan payment.

11.     However, rather than comply with the HAMP guidelines, Wells Fargo systematically and impermissibly collects TPP payments before completing the underwriting process.  Additionally, Wells Fargo manipulates aspects of the underwriting process, resulting in the rejection of applicants that should otherwise be qualified to receive a loan modification.

12.     Wells Fargo's manipulation of the underwriting process and the NPV criteria results in the improper rejection of modification applicants.  Thus, Wells Fargo improperly benefits at the expense of borrowers by collecting fees, government incentives, and Trial Period Plan payments it would not otherwise receive were it to engage in the program as intended.

13.     In addition to Wells Fargo's breach of the Servicer Participation Agreement, Wells Fargo breached its express loan modification offers made directly to plaintiff and Class members.  Wells Fargo extended trial period loan modification offers to plaintiff and Class members.  Wells Fargo's trial offer is clear and unambiguous: if plaintiff and Class members comply with stated requirements, Wells Fargo will provide a permanent loan modification offer.  Plaintiff and Class members held up their end of the bargain, providing Wells Fargo with financial hardship documentation and Trial Period Plan payments, but Wells Fargo has not provided permanent loan modification offers.

14.     Wells Fargo's conduct violates the law by making false and misleading representations that are likely to deceive the public, offending the public policies behind government programs designed to assist homeowners, and breaching contractual obligations.

15.     Plaintiff brings this action on behalf of himself and other similarly situated consumers in the United States whose loans have been serviced by defendant, who made an

BLOOD HURST & O'REARDON, LLP

eligible request for a HAMP trial-period loan modification, complied with trial period loan requirements, and who never received a permanent loan modification.  Plaintiff alleges causes of action for:  breach of contract (Direct – for breach of the Trial Period Plan contracts; Third Party Beneficiary – for breaching their obligations under the SPA to comply with the HAMP guidelines and modify the mortgages of distressed borrowers, and promissory estoppel, for inducing borrowers to make Trial Period Plan payments in reliance on Wells Fargo's offer to permanently modify their loans), breach of the implied covenant of good faith and fair dealing, violations of the Unfair Competition Law, and seeks declaratory and injunctive relief.

**JURISDICTION AND VENUE**

16.     This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which greater than two-thirds of the Class members are citizens of states different from Wells Fargo.

17.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 in that many of the acts and transactions giving rise to this action occurred in this district and because defendant:

        (a)     is headquartered in this district;

        (b)     is authorized to conduct business in this district and has intentionally availed itself of the laws and markets within this district through the promotion, marketing, distribution and sale of its products in this district;

        (c)     does substantial business in this district; and

        (d)     is subject to personal jurisdiction in this district.

18.     Intradistrict Assignment: Pursuant to Civil Local Rules 3-2(c)-(d), and 3-5(b), defendant is headquartered in San Francisco County, this action otherwise arises in San Francisco County, and it is therefore appropriate to assign this action to the San Francisco Division. Further, this action has been assigned to this Court.

**PARTIES**

19.     At all times relevant to this matter, plaintiff Phillip R. Corvello resides and continues to reside in Fairfield, California.  During the class period, plaintiff was eligible for a

BLOOD HURST & O'REARDON, LLP

loan modification from Wells Fargo.  Wells Fargo offered plaintiff a HAMP loan modification, and in reliance on Wells Fargo's offer plaintiff complied with all of his duties and responsibilities, including timely submitting each of the Trial Period Plan payments.  But, Wells Fargo failed to provide plaintiff with a permanent loan modification as promised.  As a direct result of Wells Fargo's unlawful and unfair conduct described herein, including its breach of contract, plaintiff suffered injury in fact and lost money or property.

20.     Defendant Wells Fargo N.A. is incorporated in the state of North Dakota, and is headquartered in San Francisco, California.  Defendant is registered to do business in the State of California, and does business in the State of California.  From its headquarters in California, defendant markets, sells, and services residential home mortgage loans throughout the United States, including to tens of thousands of consumers in the State of California.  Based on 2009 year-end data, Wells Fargo Home Mortgage was the nation's number one total mortgage producer and the number two servicer of home mortgages.  America's Servicing Company ("ASC") is a division of Wells Fargo Home Mortgage that services loans, originated and underwritten by Wells Fargo and other lenders.

## FACTUAL ALLEGATIONS

### The Congressional Response to the Economic Crisis of 2008

21.     The Emergency Economic Stabilization Act of 2008 (the "Act"), commonly referred to as the "bailout" of the United States' financial system, was enacted in response to the subprime mortgage crisis authorizing the United States Secretary of the Treasury to purchase distressed assets, especially mortgage-backed securities, and make capital injections into the United States' banking system.  The Act was signed on October 3, 2008.  12 U.S.C. §5201.

22.     The purpose of the Act was twofold: to restore liquidity and stability to the financial system, and to "preserve homeownership."  *Id.*

23.     In addition to allocating $700 billion to the United States Department of the Treasury, the Act also specifically granted the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program or TARP.  12 U.S.C. §§5211, 5225 (2008).  In the

BLOOD HURST & O'REARDON, LLP

00100370

BLOOD HURST & O'REARDON, LLP

1   administration of TARP, Congress mandated that the Secretary "shall" take into consideration
2   the "need to help families keep their homes and to stabilize communities."   12 U.S.C.
3   §5213(3).   To that end, Congress further created two specific sections within Title I of the Act
4   related to homeowners.   *Id.*   Section 109 is entitled "Foreclosure Mitigation Efforts."   Section
5   109 specifically states that the Secretary "shall" implement a plan to "maximize assistance for
6   homeowners."   12 U.S.C. §5219(a).   These efforts must be coordinated with other federal
7   agencies including the Federal Housing Finance Agency, which was established as the
8   conservator for Fannie Mae and Freddie Mac.   *Id.*

9        24.   The Act further requires the Secretary to consent to any reasonable loan
10   modification offer: "[T]he Secretary shall consent, where appropriate, and considering net
11   present value to the taxpayer, to reasonable requests for loss mitigation measures, including
12   term extensions, rate reductions, principal write downs, increases in the proportion of loans
13   within a trust or other structure allowed to be modified, or removal of other limitations on
14   modifications."   12 U.S.C. §5219(c).   Similarly, Section 110 requires the Federal Housing
15   Finance Agency, as conservator for Fannie Mae and Freddie Mac, to create and implement a
16   plan to prevent foreclosures.   Specifically, the Act states: "[T]he Federal property manager
17   [defined, in part, as the Federal Housing Finance Agency] shall implement a plan that seeks to
18   maximize assistance for homeowners and … minimize foreclosures."   12 U.S.C. §5220(b).
19   The statutory tools to be used by Fannie Mae and Freddie Mac include reducing interest rates
20   and reducing the principal balance of mortgage loans.   *Id.* §5220(b)(2).

21        **The Creation of the Making Home Affordable Program and HAMP**

22        25.   Pursuant to its legal authority, the Secretary of the Treasury and the Director of
23   the Federal Housing Finance Agency created and announced the Making Home Affordable
24   Program on February 18, 2009.   The Making Home Affordable program consists of two sub-
25   programs.   The first sub-program relates to the creation of refinancing products for individuals
26   with minimal or negative equity in their home, which eventually was entitled the Home
27   Affordable Refinance Program or HARP.   The second sub-program relates to the creation and

28

FIRST AMENDED CLASS ACTION COMPLAINT                                6

1   implementation of a uniform loan modification protocol, which eventually was entitled the

2   Home Affordable Modification Program or HAMP.

3       26.     HAMP is the specific program at issue in this case.  The scope of HAMP is

4   broad; approximately three to four million homeowners in the United States are potentially

5   eligible for the program.  The Treasury Department has allocated, at minimum, $50 billion of

6   its TARP money to fund the refinance and modification programs and offered an additional

7   $25 billion of non-TARP funds, totaling $75 billion.  12 U.S.C. §5211(a)(1) (authorizing the

8   Secretary to use TARP funds to purchase assets in accordance with the Emergency Economic

9   Stabilization Act of 2008).

10      27.     HAMP applies to any mortgage loan owned by Fannie Mae and Freddie Mac,

11  as well as any loans owned by companies that accepted other TARP money or volunteered to

12  participate in the program.

**Wells Fargo's Obligation to Participate in HAMP**

14      28.     Wells Fargo is in the business of servicing residential mortgage loans.

15      29.     In consideration for receipt of federal funds and loan guarantees under TARP,

16  Participating Servicers, including Wells Fargo, were required to execute a Servicer

17  Participation Agreement ("SPA") with the Treasury Department.

18      30.     On April 13, 2009, Michael J. Heid of Wells Fargo Home Mortgage executed a

19  Servicer Participation Agreement.  *See* Exhibit A.

20      31.     By voluntarily executing a Servicer Participation Agreement, Wells Fargo

21  became a "participating servicer," and is thereby contractually bound by HAMP's

22  requirements, including performing HAMP's loan modification directives.

23      32.     The SPA expressly incorporated all of the HAMP "Program Documentation"

24  available to Participating Servicers at www.HMPadmin.com, and "includes all of the Program

25  Guidelines and Supplemental Directives issued by Treasury and made available to

26  Participating Servicers at www.HMPadmin.com prior to the Effective Date of the Agreement,"

27  which "may be modified or amended from time to time."  *See* Exhibit A, Servicer Participation

28  Agreement, at 2.

FIRST AMENDED CLASS ACTION COMPLAINT                                    7

BLOOD HURST & O'REARDON, LLP

33.     Collectively, the Program Documentation forms the whole of the duties and obligations that Participating Servicers, including Wells Fargo, must comply with "for all mortgage loans it services, whether it services such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities." *Id.* at ¶2.A.

34.     Pursuant to the terms of the Servicer Participation Agreement, Wells Fargo "wishes to participate in [HAMP] as a Participating Servicer on the terms and subject to the conditions set forth herein." *Id.*

35.     Paragraph A of Part 1 of Wells Fargo's Servicer Participation Agreement, entitled "Services," states in relevant part that:

> Servicer **shall** perform the loan modification and other foreclosure prevention services (collectively, the "Services") described in (i) the Financial Instrument attached hereto as Exhibit A (the "Financial Instrument"); (ii) the Program guidelines and procedures issued by the Treasury, including, without limitation, the net present value assessment requirements of the Program (the "Program Guidelines"); and (iii) any supplemental documentation, instructions, bulletins, letters, directives, or other communications, including, but not limited to, business continuity requirements, compliance requirements, performance requirements and related remedies, issued by the Treasury, Fannie Mae, or Freddie Mac in order to change, or further describe or clarify the scope of, the rights and duties of the Participating Servicers in connection with the Program.

Ex. A at ¶1(A) (bold and italics added).

36.     Wells Fargo's Servicer Participation Agreement also states:

> Servicer **shall** perform the Services for all mortgage loans it services, whether it services such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities (each such other party, an "Investor"). Servicer **shall** use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any modification of a mortgage loan under [HAMP].

Ex. A at ¶2(A) (bold and italics added).

37.     In return for Wells Fargo's modification of eligible loans, the Servicer Participation Agreement requires Fannie Mae to pay Wells Fargo, investors and eligible borrowers certain sums up to a cap of $2.873 billion dollars for all of Wells Fargo's loan modifications under the Servicer Participation Agreement. *See* Ex. A at ¶4(D).

BLOOD HURST & O'REARDON, LLP

00100370

38.     The Treasury's Summary of Guidelines for the Making Home Affordable Program states that the overall program "*will offer assistance to as many as 7 to 9 million homeowners*, making their mortgages more affordable and helping to prevent the destructive impact of foreclosures on families, communities and the national economy.  Attached hereto as Exhibit B is the Treasury's Summary of Guidelines.   According to the Summary of Guidelines, HAMP "will help up to 3 to 4 million at-risk homeowners avoid foreclosure by reducing monthly mortgage payments."  *Id.*

### Wells Fargo's Obligations Pursuant to the HAMP Guidelines

39.     Upon entering the SPA, loan servicers, including Wells Fargo, agreed to perform the loan modifications in accordance with the guidelines set forth by the Treasury Department.  In March 2009, the Treasury Department issued uniform guidance for loan modifications across the mortgage industry and subsequently updated and expanded that guidance in a series of policy announcements.

40.     Since HAMP's inception, Supplemental Directives were issued by the Treasury Department, Fannie Mae, and Freddie Mac, supplementing and/or clarifying the original obligations under the SPA, including:

| SD | Issue Date of SD | Effective Date of SD | Title of SD |
|----|------------------|----------------------|-------------|
| 09-01 | April 6, 2009 | April 6, 2009 | Introduction to the Home Affordable Modification Program |
| 09-02 | April 21, 2009 | April 21, 2009 | Fair Housing Obligations Under the Home Affordable Modification Program |
| 09-03 | July 6, 2009 | July 6, 2009 | Trial Period Guidance |
| 09-04 | July 31, 2009 | September 1, 2009 | Home Price Decline Protection Incentives |
| 09-06 | September 11, 2009 | December 1, 2009 | Data Collection and Reporting Requirements Guidance |
| 09-07 | October 8, 2009 | October 8, 2009/ March 1, 2010 | Streamlined Borrower Evaluation Process |
| 09-08 | November 3, 2009 | January 1, 2010 | Borrower Notices |

BLOOD HURST & O'REARDON, LLP

00100370

| SD | Issue Date of SD | Effective Date of SD | Title of SD |
|---|---|---|---|
| 09-10 | December 23, 2009 | December 23, 2009 | Temporary Review Period for Active Trial Modifications Scheduled to Expire on or before January 31, 2010 |
| 10-01 | January 28, 2010 | June 1, 2010 | Program Update and Resolution of Active Trial Modifications |
| 10-02 | March 24, 2010 | June 1, 2010 | Borrower Outreach and Communication |
| 10-04 | May 11, 2010 | August 1, 2010 | Home Affordable |

41.     In August, 2010, the Treasury Department issued the Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages (Version 2.0) (hereinafter "HAMP Handbook").   A copy of the HAMP Handbook is attached as Exhibit C.   The HAMP Handbook sought to create a "consolidated resource for guidance related to the MHA Program for mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac." *See* Exhibit D, Supplemental Directive 10-09.   "The Handbook incorporates and supersedes in their entirety Supplemental Directives 09-01, 09-02, 09-03, 09-04, 09-06, 09-07, 09-08, 09-10, 10-01, 10-02 and 10-04." *Id.*   Further, to the extent there are any discrepancies or inconsistencies between the HAMP Handbook and the supplemental directives, the HAMP Handbook is controlling. *Id.*   Accordingly, the mandates in the HAMP Handbook govern the obligations of Participating Servicers with respect to all loans they service. *Id.*; Exhibit C, at p. 6.

**Wells Fargo is Obligated to Initiate Loan Modifications**

42.     Under the SPA and the HAMP Handbook, Wells Fargo is obligated to create clear and comprehensive internal written policies for the identification and solicitation of borrowers potentially eligible for HAMP based on information in the servicer's (Wells Fargo's) possession.  Ex. C, HAMP Handbook at §2.2.

43.     The HAMP Handbook mandates that if Wells Fargo's records indicate that a borrower has a first-lien mortgage and is two or more payments past due or unpaid, then Wells Fargo *must* pre-screen the mortgage to determine if it meets the following criteria: (a) the

BLOOD HURST & O'REARDON, LLP

00100370

subject property is a one-to-four unit residential property; (b) the subject property is occupied by the borrower as their principal residence; (c) the property is not vacated or condemned; (d) the loan was originated before January 1, 2009; (e) the unpaid principal balance ("UPB") does not exceed HAMP limits; and (f) the borrower has not been previously modified under HAMP. Ex. C, HAMP Handbook at §2.2.  If the borrower meets these criteria, then Wells Fargo ***must proactively solicit the borrower for HAMP***.  *Id.*

44.     The HAMP application process may also be initiated when a borrower who is at risk of imminent default contacts Wells Fargo.

45.     The HAMP requirements mandate that Wells Fargo continue to make efforts to contact the borrower.  Ex. C, HAMP Handbook at §2.2.1.  If the borrower expresses an interest in HAMP, "the servicer must send a written communication to the borrower via regular or electronic mail that clearly describes the Initial Packet."  *Id.* at §2.2.2.  This communication must:

(a)     Describe the income evidence required to be evaluated for HAMP;

(b)     Provide a Request for Modification and Affidavit ("RMA") (or other proprietary financial information form substantially similar in content to the RMA and, if necessary, a Hardship Affidavit); and

(c)     Include an Internal Revenue Service (IRS) Form 4506T-EZ (or IRS Form 4506-T, if necessary).

*Id.*

46.     These documents are collectively referred to as the "Initial Packet."  Ex. C, HAMP Handbook at §4.  After this information is conveyed, it becomes the borrower's obligation to submit to Wells Fargo all information required in the Initial Packet.  The purpose of the Initial Packet is to confirm that the borrower is in fact distressed and financially eligible to receive a modification.

**Wells Fargo is Required to Process Each Modification Applicant Through a
Two Step Underwriting Process**

47.     After Wells Fargo collects the information in the Initial Packet, it screens the applicants through the HAMP underwriting process to determine:  (a) the feasibility of the modification (referred to as the HAMP "waterfall" procedure); and (b) whether the value of

FIRST AMENDED CLASS ACTION COMPLAINT                                   11

BLOOD HURST & O'REARDON, LLP

the modified loan exceeds the expected value of the loan were it not modified (the "Net Present Value" test).

### A.     The HAMP "Waterfall Procedure"

48.     Using the information provided by the borrowers in the Initial Packet, Wells Fargo is required to determine the borrower's eligibility for a modification.  *Id.* §6.  The HAMP Waterfall procedure is a series of steps that the mortgage servicer must engage in order to reduce the mortgage payment to the target level of affordability.

49.     The first step in the underwriting process is to determine the borrower's Monthly Mortgage Payment ratio.  In order to qualify for HAMP, "the ratio of the borrower's current monthly mortgage payment to the monthly gross income of all borrowers on the mortgage note" must be greater than 31 percent.  Ex. C, HAMP Handbook at §6.1.  That is, the borrower must be spending more than 31% of their gross income on their mortgage payment.  If the ratio is less than 31%, the borrower is not eligible.  If the borrower's ratio exceeds 31%, then Wells Fargo is required to apply HAMP's "waterfall procedure" to determine the terms of the modification.  *Id.* §6.3.

50.     The goal of the "waterfall procedure" is to reduce or modify the borrower's monthly mortgage payment to make it equal to approximately 31% of their gross income.  The HAMP "waterfall procedure" is a series of steps participating servicers, including Wells Fargo, must apply in order to achieve this reduction including, in summary, the following:

> To achieve the target monthly mortgage P&I payment amount, [the Participating Servicer must] complete each step in the order listed here, and proceed to the next one – only if needed, to reach the target 31% monthly mortgage payment ratio
>
> (a)     Capitalize accrued interest, escrow advances, and acceptable servicing advances to third parties by adding to loan balance (if allowed by applicable law);
>
> (b)     Reduce interest rate in .125% increments, to not less than 2%;
>
> (c)     Extend mortgage term by up to 480 months;
>
> (d)     Provide principal forbearance only if needed to reach 31% target

*See* Ex. C., HAMP Handbook §6.3.

51.     Once Wells Fargo, reaches the target monthly mortgage payment ratio (31%), it has established the applicable modified scenario.

**B.     The Net Present Value  ("NPV") Test**

52.     After the waterfall achieves the target payment ratio, the second step in the underwriting process is to conduct the Net Present Value (NPV) test to determine if the loan is still feasible under the modification scenario[1].  Ex. C, HAMP Handbook, §7.  The HAMP Handbook provides:

> All loans that meet HAMP eligibility criteria ... must be evaluated using a standardized NPV test that compares the NPV result for a modification to the NPV result for no modification…   If the NPV result for the modification scenario is greater than the NPV result for no modification, the result is deemed 'positive' and the servicer must offer the modification.

*See* Ex. C, HAMP Handbook §7.

53.     The NPV test permits Wells Fargo to determine if the value of the modified loan exceeds the value to Wells Fargo in proceeding with the un-modified loan.  The HAMP guidelines mandate that Wells Fargo modify all NPV-positive loans to ensure that there is help for all distressed borrowers when an objective test demonstrates the modification will benefit both the borrower and the investor.  The program does not require Wells Fargo to modify the loan if the modification tests negative, though Wells Fargo must consider other ways to prevent foreclosure.

54.     The Treasury Department designed and implemented a model net present value formula entitled, the "Base NPV model" specifically for HAMP. Participating Servicers are required to use the Base NPV model to satisfy the HAMP guidelines mandating that all eligible loans which test NPV positive are modified.  There are four primary components of the NPV model: (a) Discount Rate; (b) Default Rate; (c) Home Price projections; and (d) REO (foreclosed or real estate owned) Discount.

---

[1]     In general, NPV refers to the value today of a cash-generating investment – such as a bond or mortgage loan.  When an investor is faced with a choice between two alternative investments – specifically, between the timing and amounts of the cash flows for each investment – the investor obviously prefers the choice that has a higher present value.  *See Ex. E,* HAMP Base NPV Model Specifications, June 11, 2009.

FIRST AMENDED CLASS ACTION COMPLAINT                                            13

BLOOD HURST & O'REARDON, LLP

55.    Large Participating Servicers (those servicing mortgage assets in excess of 40 billion dollars), including Wells Fargo, are permitted limited discretion to design proprietary NPV models, which customize two of the four components: (a) Discount Rate, and (b) Default Rate.  Wells Fargo is not permitted to adjust the other two components.  *See* Ex. E at p. 2, HAMP Base NPV Model Specifications, June 11, 2009.

**Wells Fargo is Required to Complete the Underwriting Process and Approve the Borrowers' Application Prior to Accepting Trial Period Payments**

56.    After Wells Fargo determines that the borrower is eligible for the modification, and confirms the feasibility of the new loan modification terms through the waterfall procedure and the NPV test, Wells Fargo is required to provide the eligible borrower a "Trial Period Plan" ("TPP") contract offer.

57.    The Trial Period Plan is a three month period in which Wells Fargo offers the eligible borrower a modified mortgage payment that has been reduced in accordance with the modification criteria established in the HAMP Handbook.  Wells Fargo utilizes a standard form Trial Period Plan agreement to offer the plans to all eligible borrowers.  This TPP agreement sets forth the borrowers' obligations under the plan, and promises a permanent loan modification to the borrowers if the conditions of the Trial Period Plan agreement are met.

58.    At no time during the HAMP program was Wells Fargo permitted to accept *payments* under the Trial Period Plan until *after* the underwriting process described above was completed.  Under the prior HAMP Guidelines, Wells Fargo was required to confirm underwriting and eligibility before the TPP was effective.  Ex. F, Supplemental Directive 09-01, at 15.  Under the current HAMP Guidelines, Wells Fargo is required to review all documentation, including the Initial Packet, within 30 days of receipt from the borrower (*see* Ex. C, HAMP Handbook §4.6), and it cannot make a Trial Period Plan offer until it has completed the underwriting process for the borrower.

59.    If, *after* the underwriting process, the borrower qualifies for HAMP, Wells Fargo *must* place the borrower in a Trial Period Plan ("TPP").  Ex. C, HAMP Handbook at §8; *see also* Ex. F, Supplemental Directive 09-01, at 15. Upon initiation, the TPP lasts three

1    months and is governed by the terms of the TPP Notice.  Ex. C, HAMP Handbook at §8.  The

2    amounts of the Trial Period Plan payments are "set at the target monthly mortgage ratio by

3    applying the standard waterfall as set forth in Section 6.3."  *Id.* §8.3.  Borrowers must keep all

4    Trial Period Plans "current" throughout the entire TPP.  *Id.*

**Wells Fargo is Required to Offer All Borrowers that Complete the Trial
Payment Plan a Permanent Modification**

60.    Under HAMP's Guidelines, Wells Fargo is required to offer all borrowers who

made the TPP payments on a timely basis and who satisfy all other trial period requirements a

permanent modification: "Borrowers who make all trial period payments timely and who

satisfy all other trial period requirements will be offered a permanent modification."  *See* Ex.

C, HAMP Handbook at §8.

61.    The standardized Trial Period Plan agreement provides that if the borrower

satisfies the conditions precedent, then Wells Fargo will provide the borrower with a

permanent Loan Modification Agreement:

> If I [Borrower] am in compliance with this Loan Trial Period and my
> representations in Section 1 continue to be true in all material respects, then the
> Lender will provide me with a Loan Modification Agreement, as set forth in
> Section 3, that would amend and supplement (1) the Mortgage on the Property,
> and (2) the Note secured by the Mortgage.

*See* Exhibit G, "Home Affordable Modification Program; Loan Trial Period."

62.    Wells Fargo utilizes a uniform Trial Period Plan agreement to secure the

borrowers assent, and provides each eligible borrower the standardized, adhesionary Trial

Period Plan agreements.  Wells Fargo utilizes the model Trial Period Plan agreement form

published by Fannie Mae/Freddie Mac, "Uniform Instrument Form 3158."

63.    Consistent with the intended purpose of the HAMP program, Wells Fargo is

obligated to provide those borrowers who satisfy the conditions precedent of the Trial Period

Plan agreement with permanent loan modifications.

**WELLS FARGO'S UNLAWFUL CONDUCT**

64.    Wells Fargo has routinely and systematically failed to meet its obligations

under the SPA.  Wells Fargo has failed to comply with the HAMP Guidelines to process

BLOOD HURST & O'REARDON, LLP

FIRST AMENDED CLASS ACTION COMPLAINT                                                     15

requests for loan modifications in a timely manner and perform the underwriting calculations to determine borrower eligibility for permanent modifications ***prior to*** accepting payments made in accordance with the Trial Period Plan agreements.

65.     Instead, Wells Fargo, routinely and as a matter of custom and practice, accepted multiple months of Trial Period Plan payments from borrowers only to subsequently reject the borrowers' applications for reasons or conditions that were required to be vetted and satisfied during the underwriting process. In so doing, Wells Fargo has violated the spirit and intent of the Home Affordable Modification Program and breached the express terms of the SPA agreement, which incorporates the HAMP Guidelines set forth in the Supplemental Directives and the HAMP Handbook.

66.     The HAMP Handbook and the Trial Period Plan agreements provide limited, specific conditions the borrower must continue to satisfy while engaged in the Trial Period Plan.  Wells Fargo routinely rejects borrowers and denies permanent loan modifications during the Trial Period Plan time period for reasons that it was required to process, screen, and acknowledge during the underwriting process and prior to issuing the TPP.

67.     By delaying and manipulating the underwriting process and rejecting applicants after accepting their Trial Period Plans, Wells Fargo wrongfully accepted and retained money from Plaintiff and Class members.

68.     The HAMP program criteria is skewed to generate applicants that are more likely to test NPV positive, and produce more qualified modifications from eligible applicants than it rejects.  Despite its intention, HAMP has struggled to meet its objectives.  This is due, in large part, to unscrupulous mortgage servicers, including Wells Fargo, who engaged in careful, yet calculated decisions to circumvent their obligations under the HAMP Guidelines to game the system and improperly reject legitimate, qualified loan modification applicants.

69.     Participating Servicer accountability and servicer-specific results are reported on a monthly basis.  The report format includes the number of Trial Period Plans that have transitioned to permanent modifications as well as a break-out of the 15 metropolitan areas with the highest program activity.  The MHA Monthly Servicer Performance Report through

FIRST AMENDED CLASS ACTION COMPLAINT                    16

BLOOD HURST & O'REARDON, LLP

August of 2009 established that Wells Fargo had one of the lowest percentages of trial modifications started as a share of estimated eligible participants among all major servicers. Despite initiating its HAMP participation in April of 2009, Wells Fargo had only started trial modifications for 11% of its estimated 60+ day delinquencies. *See* Exhibit H at p.2 (Making Home Affordable Program, Servicer Performance Report Through August, 2009).

70. The MHA Servicer Performance Report Through September, 2010 provides further evidence of Wells Fargo's abysmal performance and underscores its failure to serve the objectives of HAMP, and honor its commitment to assist distressed borrowers. Through September of 2010, Wells Fargo had converted only 28% of all trial modifications into permanent modifications. *See* Exhibit I at p.5 (Making Home Affordable Program, Servicer Performance Report Through September 2010). This, despite the Guidelines' partiality to modification.

### PLAINTIFF CORVELLO

71. In September 2007, plaintiff closed escrow on a home in Fairfield, California. In connection with his purchase, plaintiff secured a mortgage from Wells Fargo.

72. On or about the beginning of May 2009, plaintiff contacted Wells Fargo and informed Wells Fargo that it was unlikely he could remain current on his mortgage payments. At that time Wells Fargo refused to discuss foreclosure options, including Trial Period Plans under HAMP. In May and June 2009, plaintiff did not make his monthly mortgage payments.

73. On May 27, 2009, Wells Fargo sent plaintiff information regarding possible mortgage solutions and how to request assistance. *See* Exhibit J attached hereto (May 27, 2009, letter from Wells Fargo).

74. On June 25, 2009, Wells Fargo sent plaintiff a "Financial Worksheet," that plaintiff completed and on or before July 10, 2009, returned to Wells Fargo with a financial hardship letter and three of his paystubs.

75. On July 17, 2009, Wells Fargo sent plaintiff a standard form letter stating, "You may qualify for a Home Affordable Modification Trial Period Plan – a way to make your payment more affordable." Exhibit K attached hereto (July 17, 2009, Wells Fargo offer).

FIRST AMENDED CLASS ACTION COMPLAINT                    17

BLOOD HURST & O'REARDON, LLP

00100370

BLOOD HURST & O'REARDON, LLP

According to Wells Fargo's July 17, 2009 offer letter, if plaintiff "qualif[ied] under the federal government's Home Affordable Modification program and compl[ied] with the terms of the Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure." *Id.* Plaintiff was told to "Act Now!" and that "To accept this offer, and see if you qualify for a Home Affordable Modification, send the 5 items listed below … not later than 08/16/2009." *Id.* at 2 (Instructing plaintiff to send: (1) two copies of the signed Trial Period Plan; (2) his first month's Trial Period Plan; (3) the enclosed Hardship Affidavit completed and signed; (4) a signed and dated copy of his tax return; and (5) specified documentation to verify his income).

76.    Plaintiff timely complied with all of the requirements of the July 17, 2009, letter, providing the required income verification statement and (notably) sent his first Trial Period Plan.

77.    According to the July 17, 2009 offer, plaintiff's "remaining Trial Period Plans set forth in the Trial Period Plan will be due on or before 10/1/2009 and 11/1/2009.  These payments should be sent instead of, not in addition to, your normal monthly mortgage payment." *Id.* at 2.

78.    On August 9, 2009, plaintiff signed the standard form Loan Trial Period agreement (the "Agreement") that was included with Wells Fargo's letter dated July 17, 2009. Ex. E attached hereto.  Pursuant to the Agreement, plaintiff made various attestations, including that he was unable to afford his mortgage payments, and that he provided documentation for all income he received.  In reliance on Wells Fargo's modification offer terms in its July 17, 2009 offer letter, plaintiff agreed to make Trial Period Plan payments of $2,185.22 on August 16, 2009, October 1, 2009, and November 1, 2009. *Id.* at 2.  According to the signed Agreement, plaintiff's trial period commenced on the date of the plan (specified as August 16, 2009) and ended on the earlier of: the first day of the month following the month in which the last Trial Period Plan payment was due, or termination of the plan. *Id.*

79.    Plaintiff timely submitted the required HAMP documentation and all three of his Trial Period Plan payments.

80.     Although plaintiff complied with all requirements, including timely submitting all three of his Trial Period Plan payments, Wells Fargo never offered him a permanent mortgage modification.

## CLASS ACTION ALLEGATIONS

81.     Plaintiff brings this lawsuit on behalf of himself and the proposed Class members under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure.  The proposed Class consists of:

> California mortgage borrowers who (a) entered into a Homeowner Affordable Modification Program ("HAMP") Trial Period Plan ("TPP") with Wells Fargo Bank N.A. a/k/a America's Servicing Company ("Wells Fargo") effective on or before March 1, 2010, and (b) made the scheduled trial payments, but (c) did not obtain permanent HAMP loan modifications as a result.

Excluded from the Class is Wells Fargo and any of its officers, directors and employees.

82.     ***Numerosity***.  The members of the Class are so numerous that their individual joinder is impracticable.  Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contains hundreds of thousands of members.  The precise number of Class members is unknown to plaintiff.  The true number of Class members is known by the defendant, however, and thus, may be notified of the pendency of this action by first class mail, electronic mail, and by published notice.

83.     ***Existence and Predominance of Common Questions of Law and Fact***. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a)     whether Wells Fargo's alleged conduct violates public policy;

(b)     whether the alleged conduct constitutes violations of the laws asserted herein;

(c)     whether plaintiff and Class members have sustained monetary loss and the proper measure of that loss;

(d)     whether plaintiff and Class members are entitled to an award of punitive damages; and

FIRST AMENDED CLASS ACTION COMPLAINT                    19

BLOOD HURST & O'REARDON, LLP

00100370

1    (e)    whether plaintiff and Class members are entitled to declaratory and

2    injunctive relief.

3    84.    ***Typicality***.  Plaintiff's claims are typical of the claims of the members of the

4    Class in that he is a member of the Class he seeks to represent.

5    85.    ***Adequacy of Representation***.  Plaintiff will fairly and adequately protect the

6    interests of the members of the Class.  Plaintiff has retained counsel highly experienced in

7    complex consumer class action litigation, and plaintiff intends to prosecute this action

8    vigorously.  Plaintiff has no adverse or antagonistic interests to those of the Class.

9    86.    ***Superiority***.  A class action is superior to all other available means for the fair

10   and efficient adjudication of this controversy.  The damages or other financial detriment

11   suffered by individual Class members is relatively small compared to the burden and expense

12   that would be entailed by individual litigation of their claims against the defendant.

13   Individualized litigation would create the danger of inconsistent or contradictory judgments

14   arising from the same set of facts.  Individualized litigation would also increase the delay and

15   expense to all parties and the court system from the issues raised by this action.  Further, the

16   adjudication of this action presents no unusual management difficulties.

17   87.    Adequate notice can be given to Class members directly using information

18   maintained in defendant's records or through notice by publication.

19   88.    Damages may be calculated, in part, from the mortgage information maintained

20   in defendant's records, so that the cost of administering a recovery for the Class can be

21   minimized.  However, the precise amount of damages available to plaintiff and the other

22   members of the Class is not a barrier to class certification.

23   89.    Unless a class is certified, defendant will retain monies received as a result of

24   its conduct that was taken from plaintiff and proposed Class members.  Unless a classwide

25   injunction is issued, defendant will continue to commit the violations alleged, and the

26   members of the Class will continue to be misled and denied their rights.

27

28

BLOOD HURST & O'REARDON, LLP

00100370

FIRST AMENDED CLASS ACTION COMPLAINT                                      20

BLOOD HURST & O'REARDON, LLP

**COUNT I**

**Breach of Contract (Breach of the Trial Period Plan Agreement)**

90.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

91.     Plaintiff brings this claim individually and on behalf of the Class.

92.     Plaintiff and Class members directly contracted with Wells Fargo for loan modifications:  Plaintiff and members of the Class on one hand, and Wells Fargo on the other, entered into a written, standard form loan modification contract.  *See* Ex. E (the signed Trial Period Plan Agreement).  Pursuant to the loan modification contract, if plaintiff and Class members complied with Wells Fargo's contractual offer "then [Wells Fargo] will provide me with a Loan Modification Agreement."  *Id.*

93.     Plaintiff and Class members complied with the terms of Wells Fargo's contractual offer.  Plaintiff and the Class members satisfied all conditions precedent of Wells Fargo's contract offer, including: (a) maintaining the representations made in Section 1 of the Trial Period Plan Agreement; and (b) making the full loan Trial Period Plan Agreement payments in a timely manner.

94.     Wells Fargo breached the contract by failing to perform its loan obligations, including offering plaintiff and Class members a permanent loan modification.

**COUNT II**

**Breach of Contract (Third Party Beneficiary – Breach of the TPA)**

95.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

96.     Plaintiff brings this claim individually and on behalf of the Class.

97.     Plaintiff and Class members are third-party beneficiaries of Wells Fargo's contractual obligations: Plaintiff and Class members are also intended third-party beneficiaries to Wells Fargo's Servicer Participation Agreement (SPA) – a written contract between Wells Fargo and the Treasury Department.

FIRST AMENDED CLASS ACTION COMPLAINT                                    21

BLOOD HURST & O'REARDON, LLP

98.     As described above, Wells Fargo and the Treasury Department intended that plaintiff and Class members benefit under the written Servicer Participation Agreement.

99.     Wells Fargo breached the contract (Servicer Participation Agreement) by failing to perform its loan modification obligations in accordance with the HAMP Guidelines and as described above.

100.    As a direct and proximate result of Wells Fargo's breach of contract – both the direct loan modification contract, and the Servicer Participation Agreement contract – plaintiff and Class members have been damaged in amounts to be proven at trial, and continue to be damaged.

101.    All conditions precedent to defendant's obligations under the contracts have occurred or been performed.

**COUNT III**

**Breach of Contract (Promissory Estoppel)**

102.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

103.    Wells Fargo communicated an offer to Plaintiff and members of the Class to provide them with a permanent HAMP loan modification if they, in return, executed the Trial Period Plan agreement and satisfied two conditions precedent: (a) the information they provided regarding their income and eligibility for the loan modification remained accurate during the time period governed by the Trial Period Plan; and (b) they make the Trial Period Plan payments.

104.    Wells Fargo's representations and the TPP agreement were intended to induce Plaintiff and members of the Class to rely upon them, to sign or acknowledge the TPP agreement and to make TPP payments.

105.    Plaintiff and members of the Class did in fact rely on Wells Fargo's representations by acknowledging the TPP agreements and submitting payments to Wells Fargo consistent with the terms of the TPP agreements.

FIRST AMENDED CLASS ACTION COMPLAINT                                22

106.    Given the mandate of the HAMP program, the charter of the Treasury Department to enact and provide for the regulation of the program, and Wells Fargo's participation in the program, the notoriety of the program and the intention of the program to assist distressed borrowers in securing permanent mortgage loan modifications, Plaintiff's and the Class members' reliance on Wells Fargo's representations and contract offer were reasonable.

107.    Plaintiff and members of the Class relied upon Wells Fargo's representations to their detriment and have not been offered permanent loan modifications.    Plaintiff and members of the Class lost money and the opportunity to engage other remedies, solutions or strategies to effectuate a resolution to their mortgage payment difficulties.

**COUNT IV**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

108.    Plaintiff hereby incorporates all paragraphs above as though fully set forth herein.

109.    In all contracts, including the contracts between the plaintiff and Class members on the one hand, and Wells Fargo on the other, there is an implied covenant of good faith and fair dealing requiring the parties to deal fairly with each other in all respects in connection with the contracts, and not to take any action which deprives of the other of the benefits of the contracts to any extent.

110.    The covenants of good faith and fair dealing include obligations, on the part of Wells Fargo to extend loan modification offers to eligible borrowers.  Wells Fargo breached the covenants of good faith and fair dealing in the contracts by charging and collecting Trial Period Plan payments from Class members, but never extending permanent loan modification offers.  As a direct and proximate result of Wells Fargo's breach, plaintiff and the other Class members have been damaged in amounts to be proven at trial, and continue to be damaged.

BLOOD HURST & O'REARDON, LLP

00100370

BLOOD HURST & O'REARDON, LLP

**COUNT V**

**Violations of the Business & Professions Code §17200, *et seq.***

111.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

112.    Business and Professions Code §17200 prohibits any "unfair, deceptive, untrue or misleading advertising."  For the reasons discussed above, Wells Fargo has engaged in unfair, deceptive, untrue and misleading advertising in violation of Business & Professions Code §17200.

113.    Business & Professions Code §17200 also prohibits any "unlawful ... business act or practice."  Wells Fargo has violated §17200's prohibition against engaging in unlawful acts and practices by, *inter alia*, making the representations and omissions of material facts, as set forth more fully herein, and violating Civil Code §§1572, 1573, 1709, 1710, 1711, 1770, 1788, et. seq, 15 U.S.C. §1692, et. seq., Business & Professions Code §17200 *et seq.*, HAMP, the California Foreclosure Prevention Act, and the common law.

114.    Plaintiff and the Class reserve the right to allege other violations of law which constitute other unlawful business acts or practices.  Such conduct is ongoing and continues to this date.

115.    Business & Professions Code §17200 also prohibits any "unfair ... business act or practice."

116.    Wells Fargo's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code §17200, *et seq.* in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

117.    In addition to the deceitful conduct, Wells Fargo's immoral and unscrupulous practices include: (a) failing to provide permanent loan modification offers to Class members despite direct contractual promises and obligations; (b) failing to provide permanent loan

FIRST AMENDED CLASS ACTION COMPLAINT                    24

modification offers to Class members despite the public policies behind HAMP, to which Wells Fargo is a signatory, wherein Wells Fargo is required to service all eligible loans under the rules of HAMP so at-risk borrowers, including Class members, can better afford their mortgage payments; (c) failing to offer eligible Class members Trial Period Plans under HAMP; (d) improperly collecting Trial Period Plan payments before completing the underwriting process to determine whether Plaintiff and Class members were indeed eligible for permanent loan modifications; (e) collecting Trial Period Plan payments from plaintiff and Class members with knowledge that they were not eligible for a permanent loan modification; (f) improperly rejecting Plaintiff and Class members for reasons or conditions that were required to satisfied, excused or otherwise discharged prior to collecting the TPP payments; and (g) manipulating its proprietary NPV formula and/or data inputs to include criteria which resulted in the improper denial of permanent loan modifications.

118. As stated in this Complaint, plaintiff alleges violations of consumer protection, unfair competition and truth in advertising laws in California and other states resulting in harm to consumers. Plaintiff asserts violation of the public policy of engaging in false and misleading advertising, unfair competition and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of Business & Professions Code §17200, *et seq.*

119. There were reasonably available alternatives to further Wells Fargo's legitimate business interests, other than the conduct described herein.

120. Business & Professions Code §17200 also prohibits any "fraudulent business act or practice."

121. Wells Fargo's claims, nondisclosures and misleading statements, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §17200.

122. Wells Fargo's conduct caused and continues to cause substantial injury to plaintiff and the other Class members. Plaintiff has suffered injury in fact and has lost money as a result of Wells Fargo's unfair conduct.

FIRST AMENDED CLASS ACTION COMPLAINT                    25

BLOOD HURST & O'REARDON, LLP

123. Wells Fargo has thus engaged in unlawful, unfair and fraudulent business acts and practices and false advertising, entitling plaintiff to judgment and equitable relief against defendant, as set forth in the Prayer for Relief.

124. Additionally, pursuant to Business & Professions Code §17203, plaintiff seeks an order and injunction requiring Wells Fargo to immediately cease such acts of unlawful, unfair and fraudulent business practices.

### COUNT VI

### Violations of the Rosenthal Fair Debt Collection Practices Act, Cal. Civil Code § 1788 *et seq.*

125. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

126. Wells Fargo is a "debt collector" under the Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act"). Cal. Civ. Code § 1788.2(c). Wells Fargo was engaging in "debt collection" activities under the Rosenthal Act when it offered the TPP with its concomitant demand for trial payments. *Id.*; *see also Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878, 885 (9th Cir. 2013).

127. Wells Fargo violated the Rosenthal Act by using false, deceptive, and misleading statements in the TPP agreement and unfair or unconscionable practices in connection with administering the TPP program, as alleged herein. Cal. Civ. Code § 1788.17, incorporating 15 U.S.C.A. §§ 1692b through 1692j. More specifically:

(a) Wells Fargo entered into these HAMP TPP agreements with Plaintiff and Class members knowing (and/or with reckless or negligent disregard for the fact) that the TPP's language was likely to mislead the least sophisticated debtor to believe he/she would receive a permanent HAMP loan modification once he/she complied with the TPP agreement's terms and conditions after three or four months. Wells Fargo did not believe it was obligated to live up to a promise of a permanent loan modification once Plaintiff and Class members complied with the TPP's terms for three or four months, Wells Fargo did not comply or intend

BLOOD HURST & O'REARDON, LLP

00100370

BLOOD HURST & O'REARDON, LLP

1    to comply with that promise, and Wells Fargo knew it lacked the administrative capacity to

2    process TPPs within that time frame.

3            (b)    Wells Fargo entered into these HAMP TPP agreements with Plaintiff

4    and Class members knowing (and/or with reckless or negligent disregard for the fact) that the

5    TPP agreement was likely to mislead the least sophisticated debtor to believe that Wells Fargo

6    (and/or the investors who owned the loans it serviced) promised it would do one of two things

7    for every borrower: either (1) give the borrower a permanent loan modification after three or

8    four months if the borrower met his or her obligations under the TPP; or (2) notify the

9    borrower before the end of the three or four-month period if he or she did not qualify for a

10   permanent loan modification. Wells Fargo did not comply or intend to comply with that

11   promise, and Wells Fargo knew it lacked the administrative capacity to process TPPs within

12   that time frame.

13         128.   The 1999 Amendment to the Rosenthal Act allows for class actions for

14   violations to the same extent they are allowed under the federal Fair Debt Collection Practices

15   Act ("FDCPA"). Cal. Civ. Code § 1788.17, incorporating 15 U.S.C.A. § 1692k; G*onzales v.*

16   *Arrow Financial Services, LLC*, 233 F.R.D. 577, 581 (S.D. Cal. 2006).

## COUNT VII

### Declaratory Relief

      129.   Plaintiff repeats and re-alleges the allegations contained in the paragraphs
above, as if fully set forth herein.

      130.   Pursuant to HAMP, the express and implied contracts, and all other duties and
obligations of the parties as explained above, an actual controversy has arisen and now exists
regarding plaintiff's rights, and defendant's obligations, relating to its practice of not offering
Trial Period Plans to eligible borrowers, and charging and collecting Trial Period Plan
payments from plaintiff and certain Class members, but never extending permanent HAMP
loan modification offers.

FIRST AMENDED CLASS ACTION COMPLAINT          27

BLOOD HURST & O'REARDON, LLP

131.   Plaintiff requests a judicial determination of his rights and duties, and the rights and duties of absent Class members.  A declaration from the Court ordering defendant to stop its illegal practices is required.

**PRAYER FOR RELIEF**

Wherefore, plaintiff prays for a judgment:

A.   Certifying the Class as requested herein;

B.   Awarding plaintiff and the proposed Class members damages;

C.   Awarding restitution and disgorgement of Wells Fargo's revenues to plaintiff and the proposed Class members;

D.   Awarding declaratory and injunctive relief as permitted by law or equity, including enjoining defendant from continuing the unlawful practices as set forth herein, and directing defendant to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by defendant by means of any act or practice declared by this Court to be wrongful;

E.   Class wide statutory damages under the Rosenthal Act, as it incorporates the remedies provisions of the FDCPA, 15 U.S.C. § 1692k, pursuant to section 1788.17 of the California Civil Code;

F.   Awarding plaintiff and the Class punitive damages;

G.   Awarding attorneys' fees and costs, including pursuant to the Rosenthal Act and section 1021.5 of the Code of Civil Procedure; and

H.   Providing such further relief as may be just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 8, 2016

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
THOMAS J. O'REARDON II (247952)

By:   _/s/ Timothy G. Blood_
TIMOTHY G. BLOOD

FIRST AMENDED CLASS ACTION COMPLAINT                 28

00100370

1                    701 B Street, Suite 1700
San Diego, CA  92101
2                    Telephone: 619/338-1100
619/338-1101 (fax)
3                    tblood@bholaw.com
lhurst@bholaw.com
4                    toreardon@bholaw.com

5                    LAW OFFICE OF PETER FREDMAN PC
PETER B. FREDMAN (189097)
6                    125 University Ave., Suite 102
Berkeley, CA  94710
7                    Telephone: 510/868-2626
510/868-2627 (fax)
8                    peter@peterfredmanlaw.com

9                    HAGENS BERMAN SOBOL SHAPIRO LLP
STEVE W. BERMAN (*pro hac vice*)
10                   THOMAS E. LOESER (202724)
1918 Eighth Avenue, Suite 3300
11                   Seattle, WA  98101
Telephone: 206/623-7292
12                  206/623-0594 (fax)
toml@hbsslaw.com

13

14                   Attorneys for Plaintiff and the Class

15                   HARRISON PATTERSON & O'CONNOR LLP
JAMES R. PATTERSON (211102)
16                   ALISA A. MARTIN (224037)
402 West Broadway, 29th Floor
17                   San Diego, CA  92101
Telephone:  619/756-6990
18                  619/756-6991 (fax)
jpatterson@hpolaw.com
19                   amartin@hpolaw.com

20                   BONNETT FAIRBOURN FRIEDMAN
& BALINT, PC
21                   ANDREW S. FRIEDMAN (AZ005425)
ELAINE A. RYAN (AZ 012870)
22                  PATRICIA N. SYVERSON (CA 203111)
2901 N. Central Avenue, Suite 1000
23                  Phoenix, AZ  85012-3311
Telephone:  602/274-1100
24                  602/798-5860 (fax)
afriedman@bffb.com
25                  eryan@bffb.com
psyverson@bffb.com

26                  Attorneys for Plaintiff

27

28

BLOOD HURST & O'REARDON, LLP

FIRST AMENDED CLASS ACTION COMPLAINT          29

00100370

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 8, 2016.

                                        *s/  Timothy G. Blood*
                                        TIMOTHY G. BLOOD

                                        BLOOD HURST & O'REARDON, LLP
                                        701 B Street, Suite 1700
                                        San Diego, CA  92101
                                        Telephone:  619/338-1100
                                        619/338-1101 (fax)
                                        tblood@bholaw.com

BLOOD HURST & O'REARDON, LLP